Nathan E. Denning *(pro hac vice pending)*
Michael L. Kenny Jr. *(pro hac vice pending)*
Daniel J. LaRose *(pro hac vice pending)*
Gabriella E. Bensur *(pro hac vice pending)*
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 551-2600
ndenning@wiggin.com
mkenny@wiggin.com
dlarose@wiggin.com
gbensur@wiggin.com

Teresa S. Renaker, Cal. Bar No. 187800
Kirsten G. Scott, Cal Bar. No. 253464
RENAKER SCOTT LLP
505 Montgomery St., Suite 1125
San Francisco, CA 94111
Telephone: (415) 653-1733
teresa@renakerscott.com
kirsten@renakerscott.com

*Attorneys for Plaintiff Leslie Berland*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| LESLIE BERLAND,<br><br>        Plaintiff,<br><br>vs.<br><br>X CORP., f/k/a TWITTER, INC., X HOLDINGS, ELON MUSK, LINDSAY CHAPMAN, DHRUV BATURA, BRIAN BJELDE, and TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY,<br><br>        Defendants. | Case No. 3:24-cv-07589-JSC<br><br><br>**COMPLAINT FOR SEVERANCE BENEFITS AND EQUITABLE RELIEF (ERISA), FOR BREACH OF CONTRACT, AND FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**JURY TRIAL DEMANDED FOR NON-ERISA CLAIMS** |

COMPLAINT

**PRELIMINARY STATEMENT**

1.      Plaintiff Leslie Berland brings this action to recover more than $20 million in employment benefits that she earned during her nearly seven years of dedicated and successful service as the Chief Marketing Officer ("CMO") of Twitter, Inc. ("Twitter"). These benefits, withheld by the wealthiest person on the planet, Defendant Elon Musk, became due to Ms. Berland when, on November 1, 2022 (five days after Musk acquired Twitter), Musk suddenly fired her. Nobody told Ms. Berland the reason for her termination, and nobody indicated it had been "for Cause" (a narrowly defined set of circumstances such as willful misconduct or a felony conviction) or identified any such "Cause." When Ms. Berland asked as to the reason, she was told the company had "no information."

2.      In truth, Musk fired Ms. Berland as petty retribution for her favorable recommendation of another Twitter employee, Jean-Philippe Maheu ("Maheu"). At Ms. Berland's suggestion, Maheu had just hours earlier accompanied Musk to a meeting with representatives from a company that had been paying to advertise on Twitter, which was Twitter's primary source of revenues. The purpose of the meeting was to try to preserve those revenues by reassuring advertisers who were nervous about the potential effects of Musk's acquisition of Twitter. At the meeting, Musk went off script, suggesting he ought to send a Tweet teasing the reinstatement of Donald Trump's then-suspended Twitter account. Maheu, speaking in front of the gathered advertisers, cautioned Musk not to do that. Embarrassed and angry, Musk blamed Ms. Berland, texting her: "JP is not going to work out. Bad recommendation." A few hours later, Musk fired Maheu and Ms. Berland simultaneously.[1] (18 days after that, Musk reinstated Mr. Trump's account.)[2]

---

[1] Musk had another reason to fire both Maheu and Ms. Berland—they were the two highest paid employees remaining at Twitter.

[2] Ryan Mac & Kellen Browning, *Elon Musk Reinstates Trump's Twitter Account*, N.Y. Times (Nov. 19, 2022), https://www.nytimes.com/2022/11/19/technology/trump-twitter-musk.html.

3.    Ms. Berland had been remarkably successful as Twitter's CMO. Among other recognitions, she had been named to Forbes' *World's Most Influential CMOs* list in 2017 and every year thereafter until she was inducted into Forbes' *CMO Hall of Fame* in 2022. Her departure from Twitter made waves in advertising circles and beyond. Reacting to the news, advertising industry leaders praised her as one of "the trusted faces of Twitter for advertisers" who was "incredibly transparent and inclusive" and "had great relationships with the senior-most people at the Fortune 500," characterizing her departure as "a likely death knell for the [Twitter] platform's viability as an ad-supported platform in the near term."[3] A Twitter VP eulogized, "it's not hyperbolic to say that no one had a bigger impact on Twitter the service—and Twitter the

---

[3] *See* Anthony Vargas, *Musk Says He Won't Make Twitter A Hellscape, But Advertisers Want To Wait And See*, Ad Exchanger (Nov. 4, 2022, 12:45 AM), https://www.adexchanger.com/platforms/musk-says-he-wont-make-twitter-a-hellscape-but-advertisers-want-to-wait-and-see/; Kate Conger, Mike Isaac, Ryan Mac & Tiffany Hsu, *Two Weeks of Chaos: Inside Elon Musk's Takeover of Twitter*, N.Y. Times (Nov. 11, 2022), https://www.nytimes.com/2022/11/11/technology/elon-musk-twitter-takeover.html.

As it turned out, many advertisers ultimately left Twitter in the wake of Musk's acquisition and offensive posts. On November 15, 2023, Musk Tweeted in support of a post containing antisemitic rhetoric. *See* Ryan Mac, *X Races to Contain Damage After Elon Musk Endorses Antisemitic Post*, N.Y. Times (Nov. 16, 2023), https://www.nytimes.com/2023/11/16/technology/elon-musk-endorses-antisemitic-post-ibm.html (noting IBM had halted advertising on the platform). Several prominent advertisers responded by pulling their advertising. *See* Ryan Mac, Brooks Barnes & Tiffany Hsu, *Advertisers Flee X as Outcry Over Musk's Endorsement of Antisemitic Post Grows*, N.Y. Times (Nov. 17, 2023), https://www.nytimes.com/2023/11/17/technology/elon-musk-twitter-x-advertisers.html (noting Disney, Apple, Paramount, and Lionsgate had left, too). Then, on November 29, 2023, during an interview at the New York Times DealBook Summit, Musk said of the fleeing advertisers, "I hope they stop [advertising]. Don't advertise" and "[g]o fuck yourself. Go fuck yourself. Is that clear? I hope it is." *See* Jacob Kastrenakes, Mia Sato, *Elon Musk tells advertisers: "Go fuck yourself"*, The Verge (Nov. 29, 2023, 7:46 PM), https://www.theverge.com/2023/11/29/23981928/elon-musk-ad-boycott-go-fuck-yourself-destroy-x. He also taunted Bob Iger, CEO of the Walt Disney Company, one of the companies that had just pulled its advertising from X. *Id.* Months later, unhappy that so many companies had indeed heard Musk clearly and decided to stop advertising, Musk's X Corp. reversed course, going so far as to file a lawsuit claiming that the World Federation of Advertisers and several member companies were engaged in an unlawful "group boycott" of X Corp. *See* Compl. at 127-31, ¶¶ 3-4, *X Corp v. World Federation of Advertisers*, 7:24-cv-00114-K (N.D. Tex. Aug. 6, 2024), ECF No. 1.

COMPLAINT                                                                                          PAGE 3

company"—than Ms. Berland. "[S]he always had your back, she always listened, she always did right, and she made Twitter 'what's happening.'"[4]

4.    Ms. Berland's termination also marked a jarring reversal from Musk's own sentiment throughout the prior week. During that time, Musk and his staff relied heavily on Ms. Berland as the primary Twitter executive assisting with the ownership transition. Musk, who wasn't speaking with any other Twitter executive at the time, personally selected Ms. Berland as the point person for his and his transition team's needs. And, in the days leading up to, and after, the acquisition, the two communicated extensively by text message, on telephone calls, and in person at Twitter headquarters. At one point, Musk's Chief of Staff Jehn Balajadia ("Balajadia") pulled Ms. Berland aside to confide, "you are the only one here [at Twitter] that Elon trusts."

5.    Musk's lack of "trust" in others at Twitter came from the months leading up to the acquisition, which were notoriously contentious. After agreeing to buy the company for $54.20 per share in April 2022, Musk then sought to back out of the deal. As early as May 2022, Musk tried to put the deal "on hold," then threatened to terminate it entirely. On July 8, 2022, Musk announced his intention to terminate the acquisition. Days later, Twitter filed a lawsuit to enforce the agreement. After a trial date was set to determine whether Twitter could enforce the purchase agreement, Musk made increasingly erratic offers to acquire Twitter for billions less than he had initially agreed, each of which Twitter refused. With a trial two weeks away, and realizing Musk was in a battle he could not win, Musk's legal team notified Twitter on October 3, 2022, that Musk would honor the original purchase agreement.

6.    The litigation over the acquisition left Musk with hard feelings towards most of Twitter's executives. To get even (and to try to increase the value of what he was buying by hundreds of millions of dollars), Musk hatched a plan to deprive those executives—including, among others, CEO Agrawal, CFO Ned Segal ("Segal"), Chief Legal Officer Vijaya Gadde ("Gadde"), and General Counsel Sean Edgett ("Edgett")—of their employment benefits,

---

[4]    *See* Mike Park (@mep), X (Nov. 1, 2022, 6:37 PM), https://x.com/mep/status/1587574596475183105.

COMPLAINT                                                                    PAGE 4

including severance and equity. Musk's plan, details of which came to light after Musk and his lawyers bragged about it to Musk's authorized biographer Walter Isaacson, was to "force a fast close" so Musk "could fire . . . top Twitter executives 'for cause' before their stock options could vest."[5] As Mr. Isaacson recounted: "'There's [a] two-hundred-million [dollar] differential in the cookie jar between closing tonight and doing it tomorrow morning,' [Musk] told me late Thursday afternoon in the war room as the plan unfolded."[6] On October 27, 2022, Musk executed his plan, forcing a fast close and immediately firing Twitter's most senior executives (notably excluding Ms. Berland), all purportedly "for Cause." Musk and his counsel Alex Spiro ("Spiro") gloated that Agrawal had "tried to resign" (an act that would have entitled him to severance) before Musk could fire him, but "we beat him."[7] Following Musk's terminations of the executives, Musk predictably denied each one benefits under the guise of "for Cause" terminations (again, notably excluding Ms. Berland). Those denials are the subject of ongoing litigation in this Court. *See Agrawal v. Musk*, Case No. 3:24-cv-01304-MMC (N.D. Cal.); *Kaiden v. Musk*, Case No. 4:24-cv-03554-MMC (N.D. Cal.); *Caldwell v. Musk*, Case No. 3:24-cv-02022-MMC (N.D. Cal.); *Personette v. Musk*, Case No. 3:24-cv-06266-JCS (N.D. Cal.).

7.    Ms. Berland's entitlement to benefits arises in part from the same benefits plans that applied to these other executives—the Twitter, Inc. Change of Control and Involuntary Termination Protection Policy, as amended and restated effective August 8, 2014 (the "Plan"); the accompanying Participation Agreement; and the 2013 Equity Incentive Plan and Award Agreements.[8] But, unlike the other executives, Ms. Berland was not a target of Musk's "fast close" strategy involving pretextual "for Cause" terminations. Instead, Musk asked Ms. Berland to assist him and his team during the transition, which she faithfully did. A mother of two, she rearranged

---

[5] *See* Walter Isaacson, *Elon Musk* 512-13 (2023).
[6] *Id.* at 512; *see also* Walter Isaacson*, The Real Story of Musk's Twitter Takeover,* Wall St. J. (Aug. 31, 2023, 11:00 AM), https://www.wsj.com/tech/elon-musk-x-twitter-takeover-5f553fa.
[7] Isaacson, *supra* note 5, at 513.
[8] Copies of the Plan, Ms. Berland's Participation Agreement, and the 2013 Equity Incentive Plan are attached hereto as, respectively, <u>Exhibits A</u>, <u>B</u>, and <u>C</u>.

her family's schedule so that she could fly from New York to San Francisco on immediate notice to accompany Musk upon his arrival at Twitter headquarters on the morning of October 26, 2022. In the meantime, working around the clock, she choreographed all of the logistics and meetings for Musk and his team. And she flew back to New York at the request of Musk's team to attend to his additional transition needs on October 27, 2022, including a meeting with Musk's advisor, Antonio Gracias ("Gracias").[9] Throughout all this time, Musk and his colleagues expressed nothing but appreciation for Ms. Berland's tireless efforts and capabilities. Even days after Musk had fired the other executives purportedly "for Cause" pursuant to his "fast close" strategy, he continued to consult with and confide in Ms. Berland. For example, on October 29, 2022, two days after his acquisition (and his termination of the other executives), Musk texted Ms. Berland, "Just left Twitter HQ. Major product improvements set in motion." The following day, October 30, 2022, the two discussed Musk's plans for a "RIF" (reduction in force). Throughout this time, nobody—not Musk nor anyone from his team—expressed any dissatisfaction with Ms. Berland, and certainly did not suggest that they believed she had engaged in any conduct that could warrant termination "for Cause" as defined in the Plan.[10]

8.     Everything changed after the October 31, 2022 advertiser meeting. Upset at being publicly second-guessed by his new employee Maheu, Musk impulsively fired both Maheu and the person who had recommended him to Musk: Ms. Berland. At the time, Musk's only explanation was his contemporaneous "Bad recommendation" text message—not a termination "for Cause" under the Plan's strict definition. Musk then had Twitter Human Resources employee Kathleen Pacini ("Pacini") call Ms. Berland (who was working in Twitter's New York office) to

---

[9] Gracias had just demanded that Twitter front Musk more than $400 million of Twitter's purchase price, exclaiming, "You're not going to wire me the fucking money? . . . . Are you saying no to Elon Musk?" *See* Kate Conger & Ryan Mac, *'Are You Saying No to Elon Musk?': Scenes from the Slash-and-Burn Buyout of Twitter*, Vanity Fair (Sept. 9, 2024), https://www.vanityfair.com/news/story/elon-musk-twitter-buyout.

[10] The Plan strictly defines "Cause" as a limited and incurable set of circumstances. *See infra* at ¶ 39. This strict definition was designed to protect Plan beneficiaries from scurrilous claims of "Cause".

COMPLAINT                                                                 PAGE 6

tell Ms. Berland that her computer access had been shut off and that security was outside her office door, ready to escort her out of the building. When Ms. Berland asked why, Pacini said she had no information. Surprised by this turn of events, Ms. Berland texted Musk, "I'm not sure what happened here. I was confused by your ["Bad recommendation"] message above and assumed we'd talk about it live." She then added:

> Just want you to know I'm rooting for you and the team. I care deeply about Twitter and the potential you can all unlock for its future. You've got some solid people around you and they'll run through walls with clear direction and goals, the ability to hyper-focus and clear unnecessary obstacles and distraction. You know better than anyone, the opportunity is massive, the stakes are incredibly high, and the sense of purpose is unmatched. Take good care of yourself and protect your energy, Twitter has a way of penetrating (and sometimes overtaking) heart, mind and soul. Be well.

Musk didn't respond. The two never spoke again.

9.      Musk's hasty decision to fire Ms. Berland over a purportedly "Bad recommendation"[11] meant that Twitter owed Ms. Berland approximately $20 million in benefits under the Plan. Not wanting to pay Ms. Berland what she was owed, which would effectively come out of Musk's own pocket as Twitter's new owner, Musk and his team fell back on the same pretext they had recently employed with Twitter's other executives—they would claim, falsely, that Ms. Berland had actually been fired "for Cause". On November 27, 2022, twenty-six days after first notifying Ms. Berland she had been fired, Musk sent a letter to Ms. Berland (the "Termination Letter"), claiming for the first time that her termination had been "for Cause," and, therefore, that she was not entitled to any benefits under the Plan—not her severance pay; not her accelerated equity vesting; not even the payment of COBRA premiums to cover health insurance for Ms. Berland and her children.[12] Musk's belated characterization of Ms. Berland's termination

---

[11] And, no doubt, with the additional incentive to rid himself of her large compensation package.
[12] A copy of the Termination Letter is attached hereto as Exhibit D.

as "for Cause" was done for the unlawful purpose of denying Ms. Berland these benefits. This is consistent with Musk's long pattern of not paying his bills.

10.    Tellingly, Musk's November 27, 2022 letter did not identify what the "Cause" of Ms. Berland's firing had supposedly been, other than to quote the Plan language:

> I write to inform you that, effective as of November 1, 2022, your employment at the Company, including as Chief Marketing Officer of the Company, was terminated for Cause, as defined in the Company's Change of Control and Involuntary Termination Protection Policy as amended and restated, effective August 8, 2014 (the "Policy") which is incorporated by reference into your Employment Agreement. Specifically, you have engaged in conduct that constitutes Cause within the meaning of the Policy, including, but not limited to, prongs (c) (an uncurable "failure to comply with the Company's written policies or rules, including its code of conduct") and (e) ("your gross negligence or willful misconduct in the performance of your duties").

(Exhibit D at 1.)

11.    It would not be until June 6, 2023, six months *after* Ms. Berland submitted a claim for benefits under the Plan (and seven months after her firing), that Musk's team (specifically, the purported "Administrator" of the Plan, a Musk employee) first identified the purported "Causes" for her firing. One was that Twitter had been mismanaged prior to Musk's acquisition, which was the same manufactured "Cause" Musk had used against the other executives he fired *before* Ms. Berland. The second was that Ms. Berland had distributed amongst her team a modest bonus pool that the company had allocated to her department after approval by in-house and outside legal counsel. The third was that Ms. Berland had traveled by charter plane to assist Musk upon his initial arrival at Twitter on October 26, 2022, purportedly in violation of company policy. But none of these were the real reason Musk fired Ms. Berland, and, regardless, the facts do not support any of these purported explanations as a legitimate basis for a "for Cause" termination as defined in the Plan. Moreover, because these purported "Causes" had never been shared with Ms. Berland until Defendants denied her claim (and, in truth, had never existed), Ms. Berland never had an opportunity to "cure" any supposed violation, as required by the Plan. (Most terminations cannot be "for Cause" "unless [the employee] [has] been provided with (i) 30 days' written notice

by the Board or [sic] the act or omission constituting 'Cause' and (ii) 30 days' opportunity to cure such act or omission, if capable of cure."[13])

12.    Ms. Berland timely appealed the denial of Plan benefits on September 18, 2023. This was Ms. Berland's first opportunity to address any of the purported reasons for her firing. As Ms. Berland pointed out in her appeal letter, Defendants' reliance on the same supposed historical mismanagement of Twitter that Musk had used to fire the other executives back on October 27, 2022, could not have been the real reason for Ms. Berland's firing because she had not been fired with the other executives. Furthermore, many of these complaints—for example, that Twitter purportedly over-spent on real estate, company-wide headcount growth, infrastructure, "lavish events," "on-premises data centers," and "off-site cloud-based hosting fees"—either had nothing to do with Ms. Berland or involved matters on which Ms. Berland was not the ultimate decisionmaker. (The one category of expense for which Ms. Berland had some autonomy as Head of People—"fringe benefits"—substantially decreased during her tenure.) Other complaints were about actions that had been taken only with the approval of the CEO (and, in some cases, the Board) or after review by Twitter's legal counsel, including Twitter's allocation of a bonus pool for Ms. Berland's department (which Twitter also did for the departments reporting to other executives). Moreover, as to her flight to meet Musk in San Francisco on October 26, 2022 (and then her return flight to New York the next day to meet with Gracias, Musk's advisor), those flights had been necessitated by Musk himself.[14] In any event, both flights

---

[13] For example, even under Defendants' erroneous theory that the charter flights (which were specifically approved by Twitter's then-CEO) were inappropriate expenses, Ms. Berland was never provided any opportunity to reimburse Twitter for the cost of those flights, which was only a small fraction of the Plan benefits she has been denied. Ms. Berland still does not even know whether Twitter ever incurred any costs for the flights (or in what amount), as Musk allegedly refused to pay the charter company, which sued for payment before reaching a confidential settlement with Twitter. *See generally* Compl., *Private Jet Servs. Grp., LLC v. Twitter, Inc.*, Case No. 1:23-cv-00210-PB (D.N.H. Mar. 27, 2023), ECF No. 1-1.

[14] It was not until the evening of October 25, 2022, that Musk told Ms. Berland he would be visiting Twitter's headquarters the following morning and expected her to be there. At the time, Ms. Berland was at home in New York alone with her two children. In addition to making family arrangements, Ms. Berland needed to find a flight that would get her to Twitter's headquarters in

COMPLAINT                                                                                    PAGE 9

were booked only after Ms. Berland sought and received approval from *her* boss at the time, CEO Agrawal, and were purchased through Twitter's usual charter-flight vendor following the usual procedures through which Twitter arranged charter-flight travel for executives. In sum, these were precisely the types of bogus accusations that the Plan's narrow definition of "Cause" (and its provision for cure) were intended to foreclose. Regardless, after taking every one of the 120 allowable days to consider Ms. Berland's appeal, Musk's team denied it.

13.    Ms. Berland now brings this action for wrongful denial of her severance benefits under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and for interference with her rights to her severance benefits in violation of ERISA Section 510. To date, no plan administrator has fulfilled its obligations as a plan fiduciary to engage in serious consideration of Ms. Berland's claim or to make an objective decision on that claim. Instead, ***Musk*** made the decision to deny Ms. Berland, along with every other former executive, all of her benefits. He then had various individuals—a SpaceX employee accountable only to Musk, along with employees from Musk's other companies—mimic the ERISA administrative process without any substantive or otherwise competent application of the pertinent Plan terms. In the absence of, among other things, a properly appointed and functioning Administrator (and where the only purported Administrator had an obvious conflict of interest), the Court reviews Ms. Berland's benefits denial *de novo*. Because her benefits denial cannot withstand *de novo* or even deferential review, and because Defendants acted in violation of ERISA Section 510, the Court should order the payment of Ms. Berland's ERISA benefits and further order appropriate equitable relief, including but not limited to restitution, disgorgement, back pay, front pay and/or equitable surcharge, and award attorneys' fees and interest.

---

San Francisco by the time Musk arrived. She also needed to use the time leading up to the flight and the flight itself to organize what Musk had requested would be a 12-hour day full of in-person meetings covering everything from review of source code to ensuring Kanye West's Twitter account was no longer suspended. All of this organizing fell to Ms. Berland alone because Musk was not communicating with any other Twitter executives at the time.

14.     Ms. Berland also brings claims for breach of contract and for breach of the implied covenant of good faith and fair dealing due to Twitter's failure to pay her the cash value of certain Restricted Stock Unit ("RSU") interests that vested before Ms. Berland's termination. These payments were due to Ms. Berland regardless of her termination (and regardless of whether that termination was "for Cause").

## THE PARTIES

15.     Plaintiff Leslie Berland ("Ms. Berland" or "Plaintiff") is a resident of New York. Ms. Berland was Twitter's Chief Marketing Officer from February 2016 through November 1, 2022. She also held the title Head of People between August 2017 and May 2021. At all relevant times, Plaintiff was, and is, a participant, as defined in ERISA § 3(7) (29 U.S.C. § 1002(7)), in the Plan.

16.     During the course of her employment at Twitter, Ms. Berland never received any material negative feedback, was never advised she had failed to follow company policies or rules, and was never advised that she had engaged in gross negligence, willful misconduct, or any other conduct that could even arguably constitute "Cause" under the Plan, because she in fact never engaged in any such conduct.

17.     Defendant X Corp. is a Nevada corporation and the successor to Twitter, Inc., a Delaware corporation, by merger. X Corp. succeeded to all of Twitter, Inc.'s obligations upon the merger that took place on October 27, 2022. Upon information and belief, X Corp. is headquartered at Twitter's former headquarters in San Francisco, California. X Corp. serves as the sponsor, a fiduciary, and funding source of the Plan. X Corp. is a wholly owned subsidiary of X Holdings.

18.     Defendant X Holdings is a Nevada corporation and the successor to X Holdings I, Inc., which facilitated the merger of X Corp. with Twitter by serving as the parent corporation to the acquisition subsidiary. X Holdings succeeded to all of X Holdings I's obligations, including its obligations under the Merger Agreement. This included the obligation to maintain and administer the Plan. Accordingly, X Holdings is a sponsor and fiduciary of the Plan.

19.     Defendant Elon Musk is the Chairman, Sole Director, Chief Technology Officer, and controlling shareholder of X Corp., the entity into which he merged Twitter. At times relevant to this Complaint, Musk also was the CEO of Twitter and X Corp. and a fiduciary of the Plan.

20.     Ownership of Twitter was transferred to Musk on October 27, 2022. As owner and then-CEO, Defendant Musk exercised discretion and control over the Plan and was thus a fiduciary of the Plan.

21.     Upon Musk's acquisition of Twitter, there was and continues to be such unity of interest and ownership between Twitter (and Twitter's successor, X Corp.) and Musk that there is no longer a separate corporate status among Musk, Twitter (and Twitter's successor, X Corp.), and X Holdings. Musk controls the decision-making and operations of X Corp. and disregards corporate formalities in conducting the operations of X Corp.

22.     On information and belief, Musk has allowed Twitter's assets to be used by his other companies, including Tesla and xAI. Additionally, Musk regularly uses employees of his other companies to conduct Twitter business and has granted them access to Twitter's systems and records. For instance, the Delaware Court of Chancery recently found that Musk "regularly uses Tesla resources to address projects at other companies he owns," including when he enlisted approximately fifty Tesla engineers to provide services to Twitter immediately following the acquisition. *See Tornetta v. Musk*, 310 A.3d 430, 494 (Del. Ch. 2024).

23.     Musk has commingled assets of his other companies with X Corp. It would therefore be inequitable and unjust to prevent Ms. Berland from recovering benefits and other remedies from Musk, who is personally responsible for and will individually benefit from the acts of X Corp. and is the alter ego of X Corp. Contemporaneous with the acquisition, Musk admitted that he viewed Twitter as his own "cookie jar" (and its funds as his own) and, for that reason, sought to deprive Twitter's executives and eventually Ms. Berland of benefits in order to line his own pockets.

24.     Defendant Lindsay Chapman ("Chapman") is a Senior Director of Human Resources at SpaceX, a company controlled by Musk. Chapman purported to serve as Administrator of the Plan, which would make her a fiduciary of the Plan within the meaning of

ERISA § 3(21), 29 U.S.C. § 1002(21). Chapman also purported to serve as a member of the Twitter Severance Administration Committee (the "Committee"), which issued the decision rejecting Ms. Berland's administrative appeal.

25. Defendants Brian Bjelde ("Bjelde"), a Vice President of Human Resources at SpaceX, and Dhruv Batura ("Batura"), an X Corp. employee who previously worked at Tesla for nearly a decade, also purported to be members of the Committee, which would make each of them a fiduciary of the Plan.

26. At all relevant times, the Plan was an employee welfare benefit plan within the meaning of ERISA § 3(1) (29 U.S.C. § 1002(1)), sponsored by Twitter, and/or its predecessor(s) and/or successor(s) in interest, and administered, at least in part, in San Francisco, California. At all relevant times, the Plan offered benefits to certain employees of Twitter, including Ms. Berland.

27. X Corp., X Holdings, Musk, Chapman, Batura, and Bjelde were or purported to be fiduciaries of the Plan within the meaning of ERISA § 3(21) (29 U.S.C. § 1002(21)). At all relevant times X Corp., X Holdings, Musk, Chapman, Batura, and Bjelde exercised or purported to exercise control over the payment of benefits under the Plan. This lawsuit arises out of the failure to grant certain benefits to which Ms. Berland was entitled under the terms of the Plan, as well as other compensation contractually owed to her.

## JURISDICTION

28. Ms. Berland brings claims for benefits, declaratory, injunctive, and monetary relief pursuant to § 502 of ERISA (29 U.S.C. § 1132), § 510 of ERISA (29 U.S.C. § 1140), and the Declaratory Judgment Act, 28 U.S.C. § 2201. This Court has subject matter jurisdiction over Ms. Berland's ERISA claims pursuant to 28 U.S.C. § 1331 because these claims arise under the laws of the United States. Ms. Berland also brings claims for breach of contract and breach of implied covenant of good faith and fair dealing, over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## VENUE

29. Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) because the Plan is administered in this District and the wrongful

conduct alleged herein took place in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b), in that a substantial portion of the events or omissions giving rise to Ms. Berland's claims occurred within this District.

## DIVISIONAL ASSIGNMENT

30.     This action should be assigned to the division in San Francisco pursuant to Civil Local Rule 3-2(c) and (d) because the subject employee benefit plan is administered in part in the City and County of San Francisco, and a substantial part of the events or omissions that give rise to the claims occurred in San Francisco.

31.     Pursuant to Local Rule 3-12(a), this case is related to four pending cases in this district: *Agrawal v. Musk*, Case No. 3:24-cv-01304-MMC (N.D. Cal.); *Kaiden v. Musk*, Case No. 4:24-cv-03554-MMC (N.D. Cal.); *Caldwell v. Musk*, Case No. 3:24-cv-02022-MMC (N.D. Cal.); and *Personette v. Musk*, Case No. 3:24-cv-06266-JCS (N.D. Cal.). These cases are related because "the actions concern substantially the same parties, property, transaction, or event" and it is "likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different Judges." Civil LR. 3-12(a).

## ADDITIONAL FACTS

### I.     The Plan

32.     Under previous CEO Jack Dorsey, Twitter adopted the Plan "to provide certain protections to a select group of key Twitter, Inc. ('Twitter' or the 'Company') employees if their employment is negatively affected by a change on control of Twitter." (Exhibit A at 1.) Change-of-control severance policies like the Plan are an important feature of modern corporate governance. They benefit shareholders by incentivizing executives to seek out and execute sale or merger opportunities that add shareholder value (as well as to stay through and oversee an acquisition in the interest of maximizing shareholder value) even if it means losing their jobs.

33.     The Plan is governed by ERISA.

34.     A participant is entitled to Plan benefits based on a change of control so long as (1) the participant is an "Eligible Employee," (2) the participant's employment ended during the "Change of Control Period," and (3) the participant's employment ended as a result of an

"Involuntary Termination." (*See id.*) If a participant meets these conditions, then the participant's employment ended through a "COC [Change of Control] Qualified Termination," and the participant will receive "the applicable Equity Vesting, Cash Severance and COBRA Benefit described herein and specified on [the participant's] Participation Agreement." (*See id.*)

35.    Ms. Berland was and is a participant in the Plan and has met all of the conditions necessary to be entitled to change-of-control benefits under the Plan.

36.    *First*, Ms. Berland is an Eligible Employee. Under the Plan, to be an Eligible Employee, the participant (1) must have been designated as eligible by the company and (2) must have executed a Participation Agreement. (*See id.*) Twitter designated Ms. Berland as eligible in her Participation Agreement, which was fully executed by Twitter and Ms. Berland on May 31, 2022. (Exhibit B at 9.)

37.    *Second*, Ms. Berland's employment ended during a Change of Control Period. A Change of Control Period is defined in the Plan as the period beginning on, and 12 months following, a Change of Control (such as a change in the company's ownership). (Exhibit A at 2-3.) A Change of Control occurred on October 27, 2022, when Musk's acquisition of the company closed.

38.    *Third*, Ms. Berland's termination was an Involuntary Termination. The Plan defines an Involuntary Termination as "a termination of employment by the Company other than for Cause, death or Disability or a termination of employment by [the employee] for Good Reason." (*Id.* at 4.)

39.    The definition of "Cause" under the Plan is:

> (a) your unauthorized use or disclosure of the Company's confidential information or trade secrets, which use or disclosure causes material harm to the Company; (b) your breach of any agreement between you and the Company; (c) your failure to comply with the Company's written policies or rules, including its code of conduct; (d) your conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any state thereof; (e) your gross negligence or willful misconduct in the performance of your duties; (f) your continuing failure to perform assigned duties after receiving written notification of the failure from the Board (or for Eligible Employees other than the Chief

Executive Officer, from the Chief Executive Officer); or (g) your failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation; provided, however, that "Cause" will not be deemed to exist in the event of subsections (b), (c) or (f) above unless you have been provided with (i) 30 days' written notice by the Board [of] the act or omission constituting "Cause" and (ii) 30 days' opportunity to cure such act or omission, if capable of cure.

(*Id.* at 2.)

40.     Because (1) Ms. Berland was an Eligible Employee, (2) her employment ended during a Change of Control Period, and (3) her termination was an Involuntary Termination, Ms. Berland's employment ended through a COC Qualified Termination. Accordingly, pursuant to her Participation Agreement, Ms. Berland was and is entitled to accelerated vesting of 50% of her then-unvested equity interests, one year of base salary, and payment for one year of COBRA benefit premiums.

41.     Nonetheless, Defendants have improperly denied Ms. Berland these benefits based on the fiction—fabricated by Defendants after the fact for the cynical purpose of denying Ms. Berland those benefits—that Ms. Berland was terminated "for Cause."

42.     The Plan requires a participant to follow the Plan's administrative claim process prior to commencing a lawsuit for benefits.

43.     As a condition precedent to filing a lawsuit pursuant to ERISA, the Plan first requires a participant to submit a claim for benefits. Upon receipt of such a claim, the Administrator of the Plan must determine whether to approve or deny the claim. If the claim is denied, then the participant may file an appeal. If the appeal is denied, then a participant may commence a lawsuit.

44.     Ms. Berland has exhausted her administrative remedies under the Plan. As described below, Ms. Berland submitted a claim for benefits on December 8, 2022 (the "Claim"), which was denied on June 6, 2023. Ms. Berland appealed that denial on September 28, 2023, and her appeal was denied on January 16, 2024.

## II.    Ms. Berland's Equity Awards

45.    Over the course of Ms. Berland's employment, Twitter routinely granted her an annual equity award as part of her compensation package. Each award vested over time. The specific vesting schedule for each award was set forth in the Award Agreement, which typically provided for quarterly vesting over a three- or four-year period.

46.    The 2013 Equity Incentive Plan and the Award Agreements contain no "for Cause" forfeiture provision. Instead, upon vesting, Ms. Berland was entitled to the equity. Nonetheless, upon her November 1, 2022 termination, Defendants failed and refused to pay Ms. Berland the full cash value of her vested interests.[15]

## III.    Musk Buys Twitter.

47.    On April 13, 2022, Musk offered to purchase Twitter at a price of $54.20 per share.

48.    On April 25, 2022, Twitter, Musk, and Musk's wholly-owned entities X Holdings I, Inc. and X Holdings II, Inc. entered into the Merger Agreement. Musk, through X Holdings I, Inc. and X Holdings II, Inc., agreed to buy Twitter for $54.20 per share in cash, for a total of $44 billion.

49.    Shortly after signing the Merger Agreement, Musk sought to back out of the deal. As early as May 2022, Musk attempted to put the deal "on hold," then threatened to terminate the acquisition. On July 8, 2022, Musk announced his intention to terminate the proposed acquisition.

50.    Days later, Twitter filed a lawsuit to enforce the agreement. After several months of litigation, Musk realized he was in a battle he could not win and agreed to close the deal on its original terms.[16]

51.    The merger transaction closed on October 27, 2022, at the originally agreed-upon price of $54.20 per share in cash.

-----------------

[15] The 2013 Equity Incentive Plan also contains a "Change in Control" accelerated vesting provision. However, the 2014 Twitter Change of Control and Involuntary Termination Protection Policy Participation Agreement supersedes any change-of-control provisions contained in any prior equity award agreements.

[16] *See* Isaacson, *supra* note 5, at 493.

1    **IV.    Defendants Unlawfully Deny Twitter Executives Their Severance Benefits.**

2        52.    In the days leading up to the closing on October 27, 2022, Musk was aware that

3    several executives would be entitled to payments under the Plan and another ERISA-governed

4    plan that required change-of-control severance, totaling approximately $200 million.

5        53.    Musk put into action a scheme to unlawfully deprive those executives of their

6    employment benefits owed under the Plan.

7        54.    Remarkably, just before taking control of Twitter, Musk and his lawyers bragged

8    to Walter Isaacson, Musk's authorized biographer and author of "The Real Story of Musk's

9    Twitter Takeover," that Musk would intentionally terminate Twitter executives to deprive them

10   of their benefits, outlining his plan to "force a fast close" so Musk "could fire . . . top Twitter

11   executives 'for cause' before their stock options could vest."[17]

12       55.    In furtherance of this scheme, Musk, knowing he was about to deprive employees

13   of their benefits, texted Ms. Berland several hours before the closing, "Critically important to put

14   the system under extreme lockdown during the transition. Only takes one arsonist to burn down

15   the building."

16       56.    Then, minutes after he acquired Twitter, Musk fired several Twitter executives,

17   including Agrawal, Segal, Gadde, and Edgett. Musk and his counsel Spiro acknowledged that

18   Agrawal had "tried to resign" but that "we beat him."[18]

19       57.    Musk deemed these terminations "for Cause" to try to circumvent the "Change of

20   Control" provisions in the Plan and deny these executives their benefits. Those denials are the

21   subject of ongoing litigation in this Court. *Agrawal v. Musk*, Case No. 3:24-cv-01304-MMC (N.D.

22   Cal.); *Kaiden v. Musk.*, Case No. 4:24-cv-03554-MMC (N.D. Cal.); *Caldwell v. Musk*, Case No.

23   3:24-cv-02022-MMC (N.D. Cal.); *Personette v. Musk*, Case No. 3:24-cv-06266-JCS (N.D. Cal.).

24

25

26    _____

27

28   [17] *See id*. at 512-13.
     [18] *Id*. at 513.

COMPLAINT                                                                    PAGE 18

1    **V.    Musk and His Team Rely Heavily on Ms. Berland During the Transition.**

2            58.    Leading up to, during, and throughout the days following the closing, Ms. Berland

3    was Musk's primary contact with Twitter, the only Twitter executive with whom Musk was

4    communicating, and the only Twitter executive team member Musk or his team asked for

5    assistance during the ownership transition.

6            59.    Ms. Berland communicated directly and extensively with Musk in the days leading

7    up to and after the closing.

8            60.    On October 25, 2022, the afternoon before Musk was set to visit Twitter

9    headquarters, Musk texted Ms. Berland, "Elon here. Are you still at Twitter?" After Ms. Berland

10   responded that she was, Musk texted her, "You avail[able] to catch up on all things??" Ms.

11   Berland offered to speak with Musk whenever he was ready.

12           61.    Musk and Ms. Berland spoke on the phone. During that call, Musk told Ms.

13   Berland that he wanted her to be present for his arrival at headquarters the next morning.

14           62.    At Musk's request, Ms. Berland flew from New York to San Francisco on less

15   than one day's notice to receive Musk upon his arrival at company headquarters on October 26,

16   2022. While preparing to travel and during her travel to headquarters, Ms. Berland single-

17   handedly devised and orchestrated all of the meetings and introductions required to satisfy Musk's

18   transition-related needs, navigating "who's who" at Twitter for Musk and his team.

19           63.    Musk relied on Ms. Berland to set up the numerous meetings he had requested.

20   For example, Musk texted Ms. Berland, "I'm fine meeting with bigger groups. I really want to

21   meet those who are writing code and doing design work," "Would be great to see a detailed global

22   breakdown of where people are geographically and in what department," and "High priority is

23   talking to the Twitter Blue engineering team."

24           64.    Musk and Ms. Berland worked well together. Musk even invited Ms. Berland to

25   weigh in on his potential Twitter handles: "Chief Twit" and "Big Bird."

26           65.    At one point during the October 26 and 27, 2022 transition meetings, Musk's Chief

27   of Staff Balajadia pulled Ms. Berland aside and said, "You are the only one here that Elon trusts."

28

COMPLAINT                                                                          PAGE 19

66.     On October 27, 2022, Ms. Berland flew back to New York at the request of Musk's team in order to meet with Musk's advisor, Gracias, the following day.

67.     Upon concluding his headquarters visit (and after Ms. Berland had already returned to New York), Musk texted Ms. Berland, "Just left Twitter HQ. Major product improvements set in motion."

68.     Thereafter, Musk continued to consult with Ms. Berland on important and substantive matters. Ms. Berland assisted Musk in scheduling his meetings in New York days after the merger closed and continued working on the transition, sharing lists of critical talent to retain across the company, introducing and connecting key leads to Musk's team, and working on Musk's plans for a reduction in force. Musk continued to trust Ms. Berland, sharing the details of his proposed staffing cuts and discussing whether employees would "get their vest" of options.

69.     Ms. Berland also worked with Musk Chief of Staff Balajadia during the ownership transition. Because of their constant communication over such a short period of time, on October 30, 2022, Balajadia texted Ms. Berland, "It definitely feels like we've known one another for more than three days I'll tell you that much. ;)."

70.     On October 31, 2022, Balajadia thought to introduce Ms. Berland to Musk's lawyer Spiro, writing, "If you're around, I'd love to connect/reconnect you with Alex Spiro." By this point, Ms. Berland was connecting with Musk's inner circle.

**VI.     Musk Sours on Ms. Berland Due to a Perceived "Bad Recommendation".**

71.     Within days of the closing, Musk traveled to New York to, among other things, meet with advertisers and Twitter personnel. Because Twitter Chief Commercial Officer Sarah Personette ("Personette") had just resigned, on October 29, 2022, Ms. Berland suggested that Musk meet with the company's Head of Global Sales, Maheu, once Musk arrived in New York.

72.     Ms. Berland wrote, "I just learned you haven't met JP Maheu yet, he is Twitter Head of Global Sales and Sarah Personette's (who resigned yesterday) successor. He oversees all advertisers globally, [and] is critical."

73.     Musk was initially receptive to the recommendation, and he asked Ms. Berland to connect him and Maheu over text.

74.     Ms. Berland introduced Musk and Maheu in advance of Musk's trip to New York.

75.     Ms. Berland and Maheu were well known in the advertising community. According to Lou Paskalis, a longtime advertising executive and current President and COO at MMA Global, a marketing trade association, Ms. Berland and Maheu "had great relationships with the senior-most people at the Fortune 500 — they were incredibly transparent and inclusive."[19]

76.     On October 31, 2022, during a meeting designed to reassure legacy Twitter advertisers that the platform would remain committed to brand safety, Musk mentioned that he had Tweeted or was about to Tweet, "If I had a dollar for every time someone asked me if Trump is coming back on this platform, Twitter would be minting money!" Speaking in front of the gathered advertisers, Maheu suggested Musk not do that. Embarrassed and upset at being questioned, Musk blamed Ms. Berland for Maheu's comment, texting her just after midnight: "JP is not going to work out. Bad recommendation." (Ignoring Maheu's advice, Musk sent this exact Tweet at 1:10pm the same day.)[20]

**VII.     Musk Terminates Ms. Berland.**

77.     On the morning of November 1, 2022, just hours after Musk's "Bad recommendation" text, Ms. Berland was fired from Twitter. Other than the purported "Bad recommendation," neither Musk nor anyone else at the company identified any reasons or cause for the termination, nor was Ms. Berland told that her termination was "for Cause" under the Plan. At approximately the same time, Maheu (who had known Musk for only hours at that point) was also fired.

---

[19] *See* Conger, Isaac, Mac & Hsu, *supra* note 3.

[20] Elon Musk (@elonmusk), X (Oct. 31, 2023, 1:10 PM), https://x.com/elonmusk/status/1587129795732770824?ref_src= twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1587129795732770824%7Ctwgr% 5E4fb4cf7edaf21d4e879f729bcccb203c49791ad3%7Ctwcon%5Es1_&ref_url=https%3A%2F% 2Fnypost.com%2F2022%2F10%2F31%2Fwill-donald-trump-be-allowed-back-on-twitter-elon-musk-comments%2F

78.     Ironically, by terminating Ms. Berland and Maheu, Musk turned Ms. Berland's and Maheu's efforts to preserve relationships with advertisers into "a likely death knell for the platform's viability as an ad-supported platform in the near term" due to the departure of "the trusted faces of Twitter for advertisers."[21]

79.     On November 7, 2022, after learning that her Twitter health insurance was "shut off," Ms. Berland texted with Musk's lawyer Spiro that she was "in purgatory personally and professionally without any documentation or clarity on [her] separation w Twitter." Spiro reassured her by response text: "The time delay in response should not be read into. Please email re cobra and I'll handle bc don't want you worried about that or kids."

80.     Spiro's reassurances were worthless. After Ms. Berland's benefits were not paid for several more weeks, her counsel contacted Spiro, who was then Acting General Counsel for Twitter, and his colleagues at Quinn Emanuel, to again request information and confirmation in writing that Ms. Berland would receive her benefits under the Plan.

81.     Ms. Berland never received either. Instead, in a letter dated November 27, 2022, Musk notified Ms. Berland that she had purportedly been terminated "for Cause" as of November 1, 2022.

82.     Musk's letter did not specify what conduct Ms. Berland had engaged in that supposedly was the "Cause" for her termination, but rather only generally alleged that Ms. Berland had failed to comply with the Twitter's "written policies" and engaged in "gross negligence or willful misconduct." (Exhibit D at 1.)

83.     This purported (and, at that time, still unspecified) "Cause" was not the reason for the termination. Rather, Musk manufactured this purported "Cause" to try to deprive Ms. Berland of the benefits to which she was and is entitled, just as he had previously tried to deprive the other executives of their benefits.

---

[21] *See* Vargas, *supra* note 3 (quoting Lou Paskalis).

**VIII.    Defendants Deny Ms. Berland's Claim for Benefits Under the Plan.**

84.    In accordance with the Plan's "Claims Procedure" (*see* <u>Exhibit A</u> at 6), on December 8, 2022, Ms. Berland submitted a Claim requesting payment of the benefits to which she was and is entitled under the Plan.

85.    In her Claim, Ms. Berland was not able to address any purported "Cause" for her termination because she had never been provided notice of "an act or omission constituting 'Cause'" or an opportunity to cure as required by the Plan and because her termination letter set forth no factual basis supporting the assertion that her termination had been "for Cause."

86.    On June 6, 2022, Ms. Berland's counsel received a letter (the "Claim Denial Letter") from Chapman (at that time and still an employee of Musk's SpaceX) wherein Chapman identified herself as the purported Administrator of the Plan with the purported authority to decide initial claims under the Plan.

87.    Chapman concluded that Ms. Berland was an Eligible Employee whose employment terminated during the Change of Control Period.

88.    However, Chapman wrote that Ms. Berland did not have an Involuntary Termination as defined by the Plan because Ms. Berland was terminated "for Cause."

89.    The purported "Cause" Chapman asserted was that Ms. Berland committed gross negligence and willful misconduct by (1) violating company policy when she traveled by charter plane to and from Twitter headquarters on October 26 and 27, 2022; (2) distributing amongst her team a $285,000 bonus pool that the company had allocated to her department, and (3) participating in alleged corporate waste.

90.    Chapman also concluded, contrary to clear language in the Plan and 2013 Equity Incentive Plan, that neither provided for the accelerated vesting of unvested equity in the event of a COC Qualified Termination.

**IX.    Defendants Withhold Documents to Which Ms. Berland is Entitled.**

91.    Pursuant to 29 CFR § 2560.503-1(h)(2)(iii), a claimant is entitled to the provision of "all documents, records, and other information relevant to the claimant's claim for benefits." Under 29 CFR § 2560.503-1(m)(8), a document, record, or other information is relevant if such

document, record, or information, among other things, "[w]as relied upon in making the benefit determination" or "[w]as submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination."

92.     Chapman identified 44 documents she purportedly reviewed in deciding Ms. Berland's Claim. On June 7, 2023, Ms. Berland's counsel asked Chapman to produce these documents. Defendants did not produce any documents until July 5, 2023, and at that point produced only 5 of the 44 documents.

93.     On July 18, 2023, Ms. Berland's counsel requested, pursuant to 29 CFR § 2560.503-1(h)(2)(iii), 39 categories of documents "relevant" (*see* 29 CFR § 2560.503-1(m)(8)) to her Claim.

94.     Among the documents Ms. Berland requested were (1) documents explicitly referenced in the Claim Denial Letter and the Claim Summary, (2) a document X Corp. had prepared (purportedly for the purpose of "assist[ing] the Administrator of the [Plan] in deciding the benefits Claim submitted by Ms. Leslie Berland") that summarized Ms. Berland's claims and other relevant documents, as well as (3) the documents listed in an appendix to the Claim Denial Letter entitled, "Appendix A – Documents Reviewed in Deciding the Claim." Such documents are indisputably relevant to Ms. Berland's Claim.

95.     Defendants later made another production containing the documents cited in Appendix A to the Claim Denial Letter, but only after requiring Ms. Berland to enter into a confidentiality agreement, something not required or provided for by ERISA. Defendants did not produce any of the other requested documents, including documents explicitly referenced in the Claim Denial Letter and Claim Summary.

96.     On July 31, 2023, two weeks after Ms. Berland's most recent request for relevant documents, counsel for X Corp. responded that "[t]he Plan administrator previously provided you all documents that are 'relevant to' Ms. Berland's claim for Plan benefits."

97.     Defendants further took the position that the "documents referenced in [Ms. Berland's] July 18 letter do not fall within the ambit of 29 C.F.R. Section 2560.503-1," even

though the documents Ms. Berland requested related to Chapman's specific findings, including documents explicitly referenced in the Claim Denial Letter and Claim Summary.

98.    To date, Ms. Berland has not been provided the relevant documents she requested.

**X.    Ms. Berland Appeals the Claim Denial.**

99.    On September 18, 2023, Ms. Berland appealed the denial of her Claim. She submitted her appeal to the Committee, which Chapman's Claim Denial Letter claimed was established to hear appeals and administer claims under the Plan.

100.    Because Ms. Berland had never been provided notice of the purported "Cause" for her termination or an opportunity to cure as required by the Plan and because, further, Musk's termination letter had not provided any factual basis for his assertion of "Cause", the appeal was the first time that Ms. Berland was able to respond to Defendants' assertions of "for Cause" termination.

101.    Ms. Berland submitted an appeal letter and 44 exhibits showing that the purported "Causes" set forth in the Claim Denial Letter were untrue, unsupported, pretextual, and otherwise deficient.

102.    Ms. Berland's appeal also addressed Chapman's erroneous conclusion that the accelerated vesting provisions of the Plan and 2013 Equity Incentive Plan no longer applied.

**A.    *Ms. Berland's Chartered Flights to Assist Musk and His Team***

103.    In her appeal, Ms. Berland disproved Chapman's assertions that Ms. Berland's travel was a violation of Twitter's travel policy and that it was willful misconduct, costing the company "approximately $200,000."

104.    Ms. Berland explained that her travel arrangements had been necessitated by Musk's own requests, had been approved by the CEO, and had been booked in accordance with Twitter's usual policies and practices for executive charter flight travel. Additionally, even if the travel had somehow violated Twitter's policy, Ms. Berland was never given the opportunity to cure, and the purported violation was nothing more than a pretextual reason for her termination.

105.    Ms. Berland's appeal also set forth in detail the facts relating to her travel, including the facts set forth below.

COMPLAINT                                                                                    PAGE 25

1

              1)  <u>Ms. Berland's Travel Arrangements Were Necessitated by Musk Himself.</u>

2        106.    On October 25, 2022, Musk reached out to Ms. Berland via text message. Over

3 the course of numerous texts and an approximately 45-minute telephone conversation that

4 concluded at 4:30pm ET, it was agreed that Ms. Berland would fly to San Francisco the next

5 morning to be present for Musk's arrival at Twitter's headquarters.

6        107.    Additionally, Musk tasked Ms. Berland with creating an agenda for his and his

7 transition team's onsite visit to Twitter's headquarters.

8        108.    Ms. Berland immediately began working to coordinate the necessary meetings and

9 logistics for Musk's visit. This required her to drop everything and communicate constantly by

10 phone, email, and text message.

11        109.    Because Ms. Berland lives in New York, she also needed to coordinate travel

12 across the country to Twitter's headquarters in San Francisco.

13        110.    Ms. Berland could not just leave her two sons, who were at home with her the

14 evening of October 25, 2022, alone with no adult supervision, and therefore Ms. Berland needed

15 to depart the morning of October 26, 2022.

16        111.    In order to continue to set up meetings for Musk and his team, Ms. Berland also

17 needed a flight with constant, reliable access to WiFi (including calling services), which would

18 not be available on a commercial flight, so that she could make calls, send text messages, and

19 send emails throughout. This was particularly important because at that time Musk was not

20 speaking with any other Twitter executives (many of whom Musk had already formed a plan to

21 terminate).

22        112.    In addition, the earliest commercial flight from New York City to San Francisco

23 the next morning, October 26, 2022, was not scheduled to land in San Francisco until 9:16am PT,

24 which was not early enough for Ms. Berland to deplane from the commercial flight and take a car

25 to Twitter headquarters in time for Musk's arrival.

26        113.    Therefore, the only option that met Musk's needs was for Ms. Berland to take a

27 charter flight the morning of October 26, 2022.

28

114.    After flying to San Francisco, Ms. Berland worked with Musk and his team at Twitter headquarters on October 26 and 27, 2022.

115.    On October 27, 2022, Musk's Chief of Staff, Balajadia, asked Ms. Berland to return to New York so she could attend a meeting the morning of October 28, 2022, with Gracias at Twitter's New York office.

116.    Ms. Berland explored options to fly back to New York in the early afternoon of October 27, 2022, on a commercial flight. As the day went on, however, she needed to remain at Twitter headquarters to continue to assist Musk, and her departure time became uncertain. In addition, it became clear that Ms. Berland would need to continue to work on the transition and remain in communication with members of the transition team, including via phone, on the return flight. (Consistent with this, Ms. Berland's assistant, Cynthia Ancheta, chose the flight option that had high-speed WiFi when coordinating the booking.)

117.    Therefore, the only option that met Musk's needs was for Ms. Berland to take a charter flight the night of October 27, 2022.

118.    Ms. Berland flew out after 10:30pm PT so she could make it back to Twitter's New York office the next day to attend the meeting with Gracias.

          2)    Ms. Berland's Travel Was Approved by Twitter's CEO and CFO.

119.    After speaking to Musk about his plans on October 25, 2022, Ms. Berland spoke to Agrawal, who was her boss and the CEO of Twitter (up until the time Musk fired him shortly after 4pm PT on October 27, 2022). She relayed her discussion with Musk, his intention to visit Twitter's headquarters the following morning, and his request that she assist in orchestrating the logistics required to meet his transition-related needs. Agrawal told Ms. Berland that, given the circumstances, she should fly by charter plane. Agrawal was the highest-ranking executive of the company and was authorized to approve such expenditures by the company.

120.    In addition to speaking with Agrawal, Ms. Berland spoke with Twitter's CFO, Segal. Segal agreed that Ms. Berland should travel to San Francisco by charter plane.

121.    By obtaining the approvals of both the CEO and CFO, Ms. Berland thereby obtained the necessary permissions for her travel under the company's policies and practices.

Moreover, having obtained approvals from both the CEO and CFO, Ms. Berland had every reason to believe that her travel was authorized by the company.

122.    Indeed, it was Taylor DeLorenzo ("DeLorenzo"), ***Agrawal's*** Executive Assistant, who booked Ms. Berland's October 26, 2022 flight.

123.    Ms. Berland also sought and received approval from Agrawal and Segal to return to New York via charter plane on October 27, 2022. Here, too, by obtaining the approvals of both the CEO and CFO, Ms. Berland thereby obtained the necessary permissions for her travel under the company's policies and practices. And, here, too, having obtained approvals from both the CEO and CFO, Ms. Berland had every reason to believe that her travel was authorized by the company.

124.    Ancheta, Ms. Berland's Executive Assistant, booked Ms. Berland's return flight. The booking was made prior to Musk's termination of Agrawal later that day.

125.    Thus, the entirety of Ms. Berland's travel was approved in advance by Twitter's CEO and CFO. Defendants never have, and never could, claim otherwise.

> 3) <u>Ms. Berland's Travel Was Booked in Accordance With Twitter's Usual Policies and Practices for Executive Charter Flight Travel.</u>

126.    Twitter's usual policy and practice for booking an executive charter flight consisted of DeLorenzo or another executive assistant, upon receiving approval from Agrawal, booking flights directly with Private Jet Services Group, LLC ("PJS"), the company Twitter used for chartered flights. Although Ms. Berland had traveled by charter flight on only one other occasion (a trip with then-CEO Jack Dorsey), DeLorenzo had booked such flights for executives many times in the past.

127.    Even though Twitter had a written document regarding standard travel stating that the "[u]se of charter or private aircraft while traveling for business is not allowed," Twitter in fact regularly booked charter flights for executives in appropriate circumstances. Thus, the written document regarding standard travel did not reflect Twitter's actual policies and practices regarding travel, in particular regarding executive travel via charter flight.

128.    In fact, Twitter entered into an Air Charter Services Blanket Purchase Agreement ("BPA") with PJS, the company Twitter used to provide charter flight travel.

129.    Twitter also regularly booked flights not in conformance with the BPA's "Designated Representative" process, which, by its written terms, designated only four individuals as having the authority to approve the booking of a charter flight.

130.    According to a Complaint filed by PJS against Twitter, *see Private Jet Services Group, LLC v. Twitter, Inc.*, Case No. 1:23-cv-00210-PB (D.N.H.) (the "PJS Case"), Twitter booked charter flights for executives on at least nine occasions that did not conform to the BPA's Designated Representative process.

131.    In its Answer to the Complaint in the PJS Case, Twitter admitted that it had paid the invoices for the nine trips identified by PJS, even though Twitter had not followed the process set forth in the BPA for those trips.

132.    Based on the company's regular approval of charter flights for executives, Twitter maintained a policy and practice for executive travel that was different from the written document regarding standard travel.

133.    Indeed, after Twitter refused to pay PJS for Ms. Berland's flights, claiming that they were unauthorized expenditures, DeLorenzo tried to set the record straight, writing, "Just wanted to send a quick note with regards to the outstanding invoice for PJS: Parag [Agrawal] *did* sign off on this expense (he was still CEO at the time of both flight purchases) for Leslie. It was an urgent need the week the deal closed, and Leslie was the main person from Twitter liaising directly with Elon. Additionally, I had been approving all of the PJS transactions prior to this one - all of which Twitter paid with no issue or mention of the below requirements. Just wanted to share additional context here." Compl. ¶ 22, PJS Case (D.N.H. Mar. 27, 2023), ECF No. 1-1 (emphasis and brackets in original).

134.    Twitter had never previously taken issue with DeLorenzo's booking of charter flights for executives who, like Ms. Berland, had obtained approval from the CEO.

135.    Martin O'Neill ("O'Neill"), the head of Head of Global Strategic Sourcing at Twitter, admitted as much in his response to DeLorenzo: "Thanks Taylor, appreciate the added

context. However, new management is not going to budge and ***while yes you had been requesting***, it doesn't change the terms agreed to in the agreement. If anything, legally we shouldn't have paid for when you made those requests or alternatively Private Jet Services could have cited breach of contract. I know you're looking for a resolution but ***[I] can't emphasize enough that new management [i.e., Musk] wants to hold firm on this.***" *Id*. ¶ 23 (emphases added).

136.    Thus, contrary to Chapman's assertion, Ms. Berland's charter flights were booked in accordance with Twitter's policies and practices. Declarations from Agrawal and Segal confirmed this: "Under the terms of the Company's Executive Travel Policy in place at the time, Ms. Berland sought and received the necessary approvals for travel on October 26 and October 27, 2022."

137.    Further, because Ms. Berland's travel was disclosed to and approved by the then-CEO and CFO, was consistent with Twitter's usual policies and practices for executive charter flight travel, and, in any event, had been necessitated by Musk's own requests, it cannot possibly be considered "willful misconduct." To the contrary, the entire episode demonstrated Ms. Berland's respect for the directives of her superiors and her dedication to Twitter and to Musk.

### 4) Ms. Berland Was Never Provided Any Opportunity to Cure This Purported "Violation".

138.    In any event, whether Ms. Berland's travel was a violation of policy is irrelevant because Ms. Berland was never provided any opportunity to cure any purported violation, as required by the Plan.

139.    To "cure" the alleged violation, Ms. Berland could have simply repaid the incurred costs.

140.    Defendants do not contend that they ever gave Ms. Berland any opportunity to cure. Instead, in the Claim Denial Letter, Chapman asserted that any policy violation was not curable. Chapman wrote, "As this is something that has already occurred, rather than an ongoing violation of policy, it is a violation that is incapable of cure." Of course, by that logic, no action or inaction is ever capable of cure, as it will, axiomatically, already have occurred.

141.    In fact, Defendants did not want to provide Ms. Berland an opportunity to cure, as they wished to deprive her of more than $20,000,000 in benefits to which she is entitled under the Plan, rather than recouping approximately 1/100th of that amount in purportedly unnecessary expenses.

5)    The Charter Flights Were Not the Real Reason for Ms. Berland's Termination.

142.    Putting aside the facts showing that the real reason for Ms. Berland's termination was Musk's displeasure with another employee (along with Ms. Berland's large compensation package), there is no evidence that Musk was even aware of Ms. Berland's flights at the time he fired her. Notably, even though Musk eventually submitted a declaration in connection with Ms. Berland's appeal, he does not say in his declaration that the flights were the reason for Ms. Berland's firing, or that he even knew about the flights when he fired her.

143.    Therefore, Ms. Berland's flights cannot be the reason Musk terminated her "for Cause." Overwhelming evidence shows that this purported "Cause" was invented for the purpose of denying Ms. Berland her benefits and enriching Musk.

**B.    Bonuses for Ms. Berland's Staff**

144.    In her appeal, Ms. Berland also showed that, contrary to Chapman's assertion, the retention bonuses her team received (totaling approximately $285,000) were not "gross negligence" or "willful misconduct" by Ms. Berland. These bonuses were approved by the company, in-house and outside legal advisors, and HR, and they were not in violation of the Merger Agreement. In any event, the bonuses were not the real reason for her termination.

1)    The Retention Bonuses Were Approved by Twitter, Legal, and HR.

145.    In October 2022, Twitter approved certain bonus compensation (totaling approximately $285,000) for employees in Ms. Berland's department.

146.    Chapman erroneously concluded that Ms. Berland "approved" or "requested" this bonus compensation for her team. Ms. Berland did not. Rather, Ms. Berland was allocated the $285,000 bonus pool and told to distribute it amongst her team members as appropriate, which Ms. Berland did in consultation with the department's HR representative.

147.    Furthermore, before determining which employees in her department should receive the awards, Ms. Berland requested and received legal advice from in-house and outside counsel that the awards: (i) complied with the Merger Agreement; and (ii) were not the type for which Musk previously declined to grant consent in June 2022. Ms. Berland specifically relied on this advice when allocating this bonus pool.

148.    Based on that legal advice and the role of other Twitter executives, the Board, and HR in approving this compensation, Ms. Berland, under the guidance of HR, allocated the bonus award pool to members of her department. She acted based on the reasoned, good-faith belief that these bonuses had been approved by the company, in-house and outside legal counsel, and HR, and consistent with her duties as CMO.

       2)    <u>The Retention Bonuses Were Not in Violation of the Merger Agreement.</u>

149.    The Merger Agreement provides that "increases in cash compensation or benefits to Company Service Providers in the ordinary course of business consistent with past practice" are permissible.

150.    Chapman failed to analyze whether the $285,000 allocated for Ms. Berland's team (which was allocated *to* Ms. Berland's team by the company, not set *by* Ms. Berland) was outside of the ordinary course of business or inconsistent with past practice. Instead, Chapman lumped this relatively modest amount together with a total of "$7.4 million in cash retention bonuses and another approximately $12.3 million in equity grants (payable over four years) during the approximately 6-month period between signing and closing" and determined that the company's payments of this larger amount, as well as the payment of $285,000 in retention bonuses, "constituted gross negligence and willful misconduct in the performance of [Ms. Berland's] duties for the Company."

151.    Ms. Berland did not have any control over the overwhelming majority of the funds Chapman identified. Rather, as discussed above, Twitter employees in Ms. Berland's department were paid a total of approximately $285,000 in bonuses, which was consistent with past company practices and, therefore, was permitted by the Merger Agreement.

3)  <u>The Retention Bonuses Were Not the Real Reason for Ms. Berland's Termination.</u>

152.    Further, there is no evidence that Musk even knew about these retention bonuses when he terminated Ms. Berland. Notably, Musk's declaration submitted in connection with Ms. Berland's appeal does not say that these bonuses were the reason for Ms. Berland's firing, or that he even knew about the bonuses when he fired her.

153.    Therefore, these retention bonuses cannot be the reason Musk terminated her "for Cause." Overwhelming evidence shows that this "Cause" was invented for the purpose of depriving Ms. Berland her benefits and enriching Musk.

## C.  *Alleged Corporate Waste*

154.    In her appeal, Ms. Berland also showed that the other company expenditures Chapman cited as "corporate waste" were not appropriately labeled as such and, in any event, did not support an assertion of "gross negligence" or "willful misconduct" by Ms. Berland. Chapman made no showing of "waste" or that Ms. Berland was responsible for any of the decisions purportedly constituting "waste". Moreover, "waste" was not the real reason for Ms. Berland's termination.

1)  <u>Chapman Did Not Actually Find Any "Corporate Waste" Attributable to Ms. Berland.</u>

155.    As an initial matter, establishing "gross negligence" or "willful misconduct" requires more than second-guessing the company's prior strategy or the manner in which it sought to implement that strategy. That Twitter previously operated in ways different from how Musk operates (or Chapman might operate) is insufficient to establish that Twitter's prior management was "grossly negligent," or engaged in "willful misconduct", or even that the strategy was wrong. Indeed, a mountain of public reporting about the state of Twitter today (including reporting on Musk's periodic claims of X Corp.'s insolvency) indicates that prior management did a far better job managing Twitter than Musk has done.

156.    In any event, the expenditures Chapman cited as waste were in fact legitimate business expenses that were incurred in furtherance of Twitter's strategy and budgetary plan as approved by Twitter's Board. Perhaps the most obvious evidence that none of these expenditures

could possibly constitute "gross negligence" or "willful misconduct" **by Ms. Berland** is that the expenditures **predated the May 2022 date on which Twitter made Ms. Berland a participant in the Plan.** In other words, Twitter, with full knowledge of these expenditures, nonetheless made Ms. Berland a participant in the Plan and granted her the substantial benefits to which she is now entitled. Chapman's conclusion that these pre-participation expenditures show gross negligence and willful misconduct by Ms. Berland thus depends on the fanciful notion that Twitter contracted with Ms. Berland for her to participate in the Plan **knowing** that she was ineligible for Plan benefits. That is not only absurd, it also runs contrary to basic notions of contracting, including the fundamental principles of good faith and fair dealing.

> 2)  Ms. Berland Did Not Approve Any of the Alleged "Corporate Waste".

157.    Furthermore, the supposed "waste" Chapman identified—the expenses associated with company-wide headcount, real estate holdings, major company-wide events, and infrastructure—could not possibly establish gross negligence or willful misconduct by Ms. Berland because Ms. Berland was not the ultimate decisionmaker for any of those decisions. And as for "fringe benefits" over which Ms. Berland had some autonomy as Head of People, she decreased those benefits substantially during her tenure. Tellingly, Chapman also accused other fired executives—Agrawal, Gadde, Segal, and Edgett—of having been "grossly negligent" and engaging in "willful misconduct" on account of these same expenses. Had Defendants truly believed that these expenses were a justification for a "for Cause" termination, and had they truly believed that Ms. Berland was responsible for these expenses, then Musk would not have retained Ms. Berland after terminating others for the exact same "gross negligence" or "willful misconduct."

158.    Chapman's only rationalization for blaming Ms. Berland for these expenditures was that Ms. Berland was a member of the "Staff" (*i.e.*, an executive). Chapman failed to explain how Ms. Berland could possibly bear any responsibility for, or otherwise have contributed to, any of the categories of alleged waste. For instance, Ms. Berland did not have any authority to make decisions, and she in fact made no decisions, concerning the company's acquisition of real estate

or infrastructure. Nor did Ms. Berland have ultimate responsibility for (or decision-making authority regarding) company-wide issues such as the company's overall headcount.

159.    Even as to events where Ms. Berland had some involvement, such as the company retreats known as #OneTeam events, which Chapman concluded were a waste of money, Chapman ignored that former CEO Jack Dorsey himself had made the decision to hold these events, that the budgets for these events had been approved, and that these events were in fact less expensive than the department-specific events the company had held previously. In sum, as Ms. Berland showed in her appeal, Chapman had no basis to accuse Ms. Berland of any "gross negligence" or "willful misconduct" in connection with any supposed corporate waste.

    3) The Alleged "Corporate Waste" Was Not the Real Reason for Ms. Berland's Termination.

160.    Chapman's attribution of alleged corporate waste to Ms. Berland is also contradicted by the simultaneous attribution of the same conduct to the Twitter executives fired on October 27, 2022, as noted above.

161.    Additionally, Musk terminated the other executives before he could have seen the documents allegedly supporting a finding of "corporate waste" or otherwise learned specific facts that Defendants now claim demonstrate gross negligence and willful misconduct. Notably, Musk's declaration submitted in connection with Ms. Berland's appeal does not say that these expenses were the reason for Ms. Berland's firing, or that he even knew about these expenses when he fired her.

162.    "Corporate waste" was just another manufactured post hoc justification for depriving Ms. Berland of the benefits to which she was and is entitled under the Plan.

**D.    *Accelerated Vesting Due to COC Qualified Termination***

163.    Ms. Berland's appeal also addressed Chapman's incorrect conclusion that the Plan and 2013 Equity Incentive Plan do not provide for the acceleration of vesting of unvested shares.

164.    Chapman did not explicitly opine on whether Ms. Berland's benefits were affected by this erroneous conclusion.

165.    Regardless, as Ms. Berland showed in her appeal, Ms. Berland's interests vested at the rate of 50% on the date of her COC Qualified Termination pursuant to the provisions of the Plan and her Participation Agreement.

**XI.    Defendants Deny Ms. Berland's Appeal.**

166.    On January 16, 2024, Ms. Berland's counsel received a letter from the Committee stating that the Committee had denied her appeal.

167.    The Committee not only ignored many of the arguments Ms. Berland made in her appeal, but it also created and relied on new "evidence," including conclusory declarations from Musk and O'Neill.

168.    These declarations make sweeping and unsupported allegations about Twitter "Staff" that purportedly apply to Ms. Berland. Among other things, the Committee relied on these declarations as catchalls to misattribute alleged waste to Ms. Berland and any other "Staff."

169.    Indeed, upon information and belief, the company used the same Musk and O'Neill declarations to deny multiple former executives the benefits to which they are legally entitled.

170.    O'Neill's declaration mentions Ms. Berland just once. In it, he states, "Under the leadership of Leslie Berland, the Marketing department undertook its own procurement and engaged in effectively unchecked corporate spending, including in the latter half of 2019 when it exceeded its quarterly budget by approximately $30 million." Nowhere does the declaration identify what the alleged spending was for or why it was wasteful. Nor does the declaration explain how expenditures that were made ***three years*** before Musk acquired Twitter—indeed, ***three years before Twitter even made Ms. Berland a participant under the Plan***—and which the prior CEO and Board had believed appropriate, could possibly constitute "gross negligence" or "willful misconduct" by Ms. Berland.

171.    Musk's declaration likewise mentions Ms. Berland just once, alleging that she engaged in "wasteful misconduct". Musk declared, "I learned that on October 26, 2022, Leslie Berland abused company resources and chartered a corporate jet, amounting to hundreds of thousands of dollars in waste. Berland did not follow company policy for this expense. Berland

was terminated for cause based on her failure to comply with Twitter's written policies or rules, including its code of conduct, and her gross negligence or willful misconduct in the performance of her duties." Notably, other than Ms. Berland's company-approved use of chartered flights to assist Musk, Musk does not identify any other specific conduct by Ms. Berland that purportedly justified a "for Cause" termination. Musk also ignores that it was his request that required Ms. Berland to fly by charter plane to meet him, that she received pre-approval from Twitter's highest-ranking executives to do so, and that the flights were consistent with Twitter's usual policies and practices for executive travel.

172.    Musk also fails to identify any reason why, even if the flights could have otherwise constituted "Cause", Ms. Berland was not afforded her right to cure under the Plan (*e.g.*, to reimburse the Company for the expenses). The Committee's letter denying Ms. Berland's appeal asserted that a breach is "not capable of cure if, under the relevant facts and circumstances, the employee's conduct reasonably causes the employer to lose trust in the employee, or otherwise damages the employment relationship beyond repair." Defendants then posit that, "Mr. Musk's belief that it would be impossible to work with [Ms. Berland] or to cure this breach is evidenced by his cutting off [Ms. Berland]'s access to the Company's system without notice on November 1, 2022, and his blocking of [Ms. Berland]'s cellphone on November 2, 2022." Tellingly, Defendants provided no support for such an assertion, and Musk's declaration glaringly omits any evidence that he in fact lost trust in Ms. Berland ***due to the flights***. Nor would any such loss of trust be reasonable, as Ms. Berland sought and obtained approval for the expenditures from her boss at the time. In any event, any loss of trust certainly cannot and does not amount to "gross negligence" or "willful misconduct" that would justify a "for Cause" termination.

173.    And, most tellingly, Musk does not claim that the flights—or any of the other reasons on which Chapman based her decision—were ***the*** "Cause" for Musk's termination of Ms. Berland, or that he even ***knew*** about any of these things at the time he abruptly fired Ms. Berland.

174.    Apparently sensitive to this final point, and knowing that the evidence would show that Musk fired Ms. Berland for reasons having nothing to do with those identified by Chapman, the Committee went on to take the remarkable position that it was "not bound by the Company's

motivations or knowledge at the time of" Ms. Berland's termination because "it is one matter for the Company to terminate an officer (for whatever reason stated or none) and a separate matter for the Committee to determine independently whether the termination rises to the level of termination 'for Cause' under the Plan." But they point to no provision of the Plan that supports such a conclusion, and, furthermore, this is all but an admission that Ms. Berland was not in fact fired "for" any of the purported "Causes" Defendants have now fabricated after the fact.

175.    With the denial of her appeal, Ms. Berland has fully exhausted any and all required administrative remedies under the Plan.

176.    In attempting to obtain payment of the benefits due to her under the Plan, Ms. Berland has been required to incur, and will continue to incur, attorneys' fees and costs that she is entitled to recover.

**XII.    Defendants' Made-Up Reasons for Ms. Berland's Termination Are Pretext For Wrongfully Depriving Ms. Berland of Her Rights Under ERISA and Part of a Pattern and Practice of Depriving Employees of Their Earned Benefits.**

177.    Defendants' characterization of Ms. Berland's termination as being "for Cause" was for the purpose of interfering with her attainment of rights and benefits under the Plan. Each of the purported "Causes" for Ms. Berland's termination was a pretext designed to deprive Ms. Berland of the benefits to which she is legally entitled. On information and belief, these manufactured allegations are part of a pattern and practice of depriving employees of their benefits.

178.    On information and belief, none of Twitter's former executives have received severance benefits following Musk's acquisition of the company. Ten former Twitter executives, including Ms. Berland, have submitted claims for benefits, all of which have been denied, all on the grounds that the executives purportedly were terminated "for Cause" and are therefore ineligible for severance benefits.

179.    This pattern and practice of Defendants refusing to pay benefits to the company's former executives is further evidence that Defendants are manufacturing "Cause" after the fact simply to avoid paying Ms. Berland what she is owed.

180.    There are also thousands of non-executive former employees whom Musk terminated and is now refusing to pay severance and other benefits. They have sued in droves. The company and Musk are facing numerous lawsuits and arbitrations brought by former employees that stem from the company's refusal to pay money owed in the aftermath of Musk's acquisition. This, too, demonstrates a pattern and practice by Defendants of refusing to pay benefits earned by and owed to former company employees.

**XIII.    Defendants' Erroneous Conclusion that the Plan Does Not Allow for Acceleration of Equity Ignores the Language of the Plan and Ms. Berland's Participation Agreement.**

181.    The Plan expressly provides for the acceleration of equity in the event of a COC Qualified Termination. Specifically, the Plan provides that as part of the benefits owed to Ms. Berland, "a percentage set forth on [her] Participation Agreement of the then-unvested shares subject to each of [her] then-outstanding equity awards shall immediately vest and, in the case of options and stock appreciation rights, shall become exercisable . . . ." Ms. Berland's Participation Agreement provides that her equity vesting acceleration benefit percentage is 50%.

182.    During the course of her employment with Twitter, Ms. Berland was granted equity awards in the form of both Restricted Stock Units ("RSUs") and Performance-Based Restricted Stock Units ("PSUs"). The RSUs vested solely through the passage of time, contingent upon continued employment through each vesting date and subject to additional provisions that accelerate vesting in the event of certain types of terminations of employment. The PSUs vested both upon the achievement of performance criteria and through the passage of time, contingent upon continued employment through each vesting date and subject to vesting acceleration provisions in the event of certain types of terminations of employment.

183.    Both the PSU and RSU agreements have language that explicitly contemplates the existence of other documents that may contain vesting acceleration provisions which would supersede the standard vesting schedule under certain circumstances, such as a COC Qualified Termination. Both agreements also explicitly provide that the awards will be subject to any vesting acceleration provisions contained in such documents. Likewise, the Participation Agreement itself explicitly says that the Plan and Participation Agreement "supersede any

severance and/or change of control provisions of any offer letter, employment agreement, or equity award agreement entered into between the you [sic] and Company."

### A.    The Merger Agreement

184.    On April 25, 2022, Twitter entered into the Merger Agreement pursuant to which it was to be acquired by X Holdings I, Inc. and X Holdings II, Inc.

185.    Section 3.6(b)(ii) of the Merger Agreement addressed the treatment of the PSUs in the merger and provided as follows:

> As of the Effective Time, each Company PSU that is outstanding immediately prior thereto and that is not a Vested Company PSU (each, an "Unvested Company PSU") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company PSU based on the achievement of the applicable performance metrics at the target level of performance and (ii) the Merger Consideration (the "Unvested PSU Consideration"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested PSU Consideration will vest and become payable at the same time as the Unvested Company PSU from which such Unvested PSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company PSU immediately prior to the Effective Time (except that performance-based vesting metrics and criteria shall not apply from and after the Effective Time).[22]

186.    Similarly, Section 3.6(d)(ii) of the Merger Agreement addressed the treatment of the RSUs in the merger and provided as follows:

> As of the Effective Time, each Company RSU that is outstanding immediately prior thereto and that is not a Vested Company RSU (each, an "Unvested Company RSU") shall be canceled and converted into the right to receive an amount in cash, without

---

[22] Twitter, Inc., Current Report (Form 8-K) 19 (April 25, 2022), https://www.sec.gov/Archives/edgar/data/1418091/000119312522120474/d310843ddefa14a.htm.

interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company RSU and (ii) the Merger Consideration (the "Unvested RSU Consideration"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSU Consideration will vest and become payable at the same time as the Unvested Company RSU from which such Unvested RSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time."[23]

187.    Sections 3.6(b)(ii) and 3.6(d)(ii) of the Merger Agreement (1) converted the right to receive Twitter stock under the terms of the PSUs and RSUs into a right to receive an equivalent amount of cash (for both the PSUs and the RSUs) that would then become vested on the same terms and conditions as were previously applicable to the PSUs and RSUs; and (2) deemed the performance-based metrics no longer applicable for the PSUs (meaning the PSUs would vest solely on the passage of time and subject to acceleration in the same manner as the RSUs). The language made it clear that all other terms and conditions of the awards—which include vesting acceleration provisions—still applied. The Twitter Board of Directors approved the treatment of both the PSUs and the RSUs consistent with Sections 3.6(b)(ii) and 3.6(d)(ii) of the Merger Agreement in its April 25, 2022, board minutes. There was no notice to the Plan participants of any change negatively impacting their rights to acceleration or otherwise under the Plan.

### B.    The Proxy Statement

188.    On May 25, 2022, following the execution of the Merger Agreement, Twitter issued a proxy statement (the "Proxy Statement"). Importantly, page 66 of the Proxy Statement contains the following language regarding the purpose of the Plan:

We believe that to properly motivate and incentivize our executive team in the event of a change of control and to the possibility of a termination without "cause" or a termination with "good reason,"

[23] *Id*. at 20.

COMPLAINT                                                                                      PAGE 41

a standardized "double trigger" change of control and severance policy is critical. Each NEO [named executive officer] that remains employed with us participates in our Severance Policy, which provides standardized payments and benefits to the NEOs in the event of a termination without "cause" by us or termination for 'good reason' by the participant, whether or not in connection with a change of control, to make these benefits consistent among the executives who have these arrangements.[24]

This description makes it clear that Twitter considered it "critical" to have the Plan in place. This language makes no mention of modifying or eliminating the equity vesting acceleration provisions of the Plan. Furthermore, this language mimics the Participation Agreement, which specifies that "The Company adopted a Change of Control and Involuntary Termination Protection Policy [the Plan] to assure that the Company will have the continued dedication and objectivity of the participants in the [Plan]."

189.    Notably, page 73 of the Proxy Statement contains a paragraph titled "Potential Payments Upon Termination or Change of Control." This paragraph describes the benefits that are provided under the Plan to participants and states that one of the benefits provided under the Plan is "acceleration of vesting of 50% (or 100% in the case of our CEO and CFO) of the shares underlying all of the NEO's then-unvested equity awards if the Involuntary Termination is in connection with a Change of Control . . . ." This language closely tracks the exact benefits that are described in Ms. Berland's Participation Agreement with respect to equity award vesting acceleration (50% vesting acceleration of all unvested equity awards).

190.    The Proxy Statement is Twitter's official statement to investors and is required by the SEC and securities laws to be true and accurate. Thus, it is notable that in the Proxy Statement issued after the Merger Agreement was signed, Twitter's interpretation of the Plan and the Participation Agreement was that the participants would receive accelerated equity vesting as part of their severance benefits. At no time did the company act to modify, amend, or correct the

---

[24] Twitter, Inc., Proxy Statement (Schedule 14A), 66 (April 12, 2022), https://www.sec.gov/Archives/edgar/data/1418091/000114036122014049/ny20001921x3_def14a.htm.

statement notifying the shareholders (including the Plan participants) that the Plan provided for accelerated vesting of time-based equity awards.[25]

191.    The only reasonable interpretation of the Plan, the Participation Agreement, the Equity Awards, the Merger Agreement, and the Proxy Statement, is that Ms. Berland is entitled to a cash payment representing 50% of her unvested interests as a component of benefits under the Plan. To the extent that Defendants determined that the Merger Agreement eliminated the right to accelerated vesting of equity, that decision is plainly wrong and unsupported.

## XIV.  Defendants' Claims Procedures Were Biased and Inadequate Due to Their Clear Conflict of Interest.

192.    Defendants have withheld documents and taken other actions designed to inhibit Ms. Berland's presentation of her Claim and to facilitate a denial of her Claim.

193.    Despite repeated requests, Defendants refused to produce all documents explicitly relied on in the Claim Denial Letter, as detailed herein.

194.    As a result, Defendants have administered the Plan's claim procedures in a way that unduly inhibits and hampers the initiation or processing of a claim for benefits.

195.    Defendants' withholding of such documents also renders their claims procedures inadequate and unfair under 29 C.F.R. § 2560.503-1(h)(2)(iii).

196.    Moreover, by virtue of their dual roles in evaluating and funding claims, Defendants are biased and operated under a conflict of interest in adjudicating Ms. Berland's claim for benefits. This conflict was exacerbated by the fact that Musk asked employees of his companies—and companies other than Twitter—who are beholden to him to evaluate the claims.

---

[25] Twitter filed a similar Proxy Statement in July 2022 in advance of its September 13, 2022 shareholder meeting in which shareholders were asked to vote on a proposal to adopt the Merger Agreement. The September 2022 Proxy Statement similarly disclosed the severance benefits to which Ms. Berland and other executives would be entitled including the "acceleration of vesting of unvested equity awards (with performance-based vesting deemed achieved at target levels as to that percentage)." Twitter, Inc., Proxy Statement (Schedule 14A), 115 (July 26, 2022), https://www.sec.gov/Archives/edgar/data/1418091/000119312522202163/d283119ddefm14a.htm.

197.    Indeed, Musk always planned to use employees from his other companies to carry out his dirty work at Twitter. In ominous foreshadowing, Musk texted Ms. Berland before the merger had even closed, "Also, I will call in people as needed from my other companies, once it becomes more obvious where the needs are."

198.    At Musk's behest, Chapman has performed a number of reviews in which she denied severance benefit claims of former employees, saving the company tens or even hundreds of millions of dollars, and was compensated by Musk via her employment for doing so. The entire termination and administrative claims process was a sham to deny in bad faith Ms. Berland's Claim and the claims of the other executives—whom Musk terminated purportedly "for Cause" specifically to deny them the benefits they are rightfully owed.

**XV.    Twitter Failed to Pay Ms. Berland Equity Awards She Was Owed on November 1, 2022.**

199.    In addition to the Plan benefits to which she is entitled, during her employment by Twitter, Ms. Berland received equity awards in the form of both RSUs and PSUs.

200.    Under the terms of her award agreements, including the 2013 Equity Incentive Plan Restricted Stock Unit Agreements, Ms. Berland's RSU and PSU interests continued to vest while she was still employed. (*See* Exhibit C.)

201.    Ms. Berland was employed through November 1, 2022. However, Twitter/X Corp. failed to pay Ms. Berland for her RSU interests that vested on that date.

**FIRST CAUSE OF ACTION**

**Claim for Plan Benefits Pursuant to**
**ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) Against All Defendants**

202.    Ms. Berland repeats and realleges each and every allegation contained above as if fully set forth herein.

203.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132 (a)(1)(B), permits a participant in a plan to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or clarify her rights to future benefits under the terms of a plan.

204.    Ms. Berland is entitled to severance benefits under the Plan in an amount exceeding $20,000,000. This amount is equal to one-year's salary of $600,000, plus fifty percent of the cash value of all of Ms. Berland's Unvested RSU Consideration and Unvested PSU Consideration interests, all valued at the acquisition price of $54.20 per share, and the value of twelve months of COBRA health insurance premiums owed to but never received by Ms. Berland.

205.    By denying Ms. Berland's claim for benefits under the Plan, and by related acts and omissions, Defendants have violated, and continue to violate, the terms of the Plan and Ms. Berland's rights thereunder.

### SECOND CAUSE OF ACTION

**Unlawful Discharge to Interfere with Right to Plan Benefits**
**Pursuant to ERISA § 510, 29 U.S.C. § 1140 Against Defendants Elon Musk,**
**X Holdings, X. Corp., Lindsay Chapman, Dhruv Batura, and Brian Bjelde**

206.    Ms. Berland repeats and realleges each and every allegation contained above as if fully set forth herein.

207.    ERISA Section 510, 29 U.S.C. § 1140, makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."

208.    Defendants Musk, X Holdings, and X Corp. discharged Ms. Berland and—along with Defendants Chapman, Batura, and Bjelde—falsely claimed that the termination was "for Cause" for the specific purpose of interfering with Ms. Berland's attainment of benefits under the Plan, in violation of ERISA Section 510, 29 U.S.C. § 1140.

209.    The provisions of ERISA § 502(a)(3), 29 U.S.C. § 1132, which provide for equitable relief (§ 502(a)(3)), govern the enforcement of claims brought pursuant to ERISA Section 510, 29 U.S.C. § 1140.

210.    Reinstatement is not appropriate or feasible given the excessive hostility and antagonism created by Defendants' actions.

211.    Ms. Berland is entitled to appropriate equitable relief, including front pay and back pay, disgorgement of profits, surcharge, and restitution, to remedy Musk, X Holdings, X Corp., Chapman, Batura, and Bjelde's violation of Section 510.

### THIRD CAUSE OF ACTION

**Breach of Contract Against Defendants Elon Musk, and X Holdings, and X Corp.**

212.    Ms. Berland repeats and realleges each and every allegation contained above as if fully set forth herein.

213.    Ms. Berland provided valuable consideration under her equity agreements by continuing employment with Twitter. She fully performed her part of the bargain by remaining employed through November 1, 2022, and by abiding by all other terms of the respective agreements.

214.    Defendants breached their agreements with Ms. Berland when they failed to pay Ms. Berland the cash equivalent of 25,913 RSUs when those rights vested on November 1, 2022.

215.    Based on the fair market value of the shares ($54.20), Ms. Berland's vested interests were valued at $1,404,484.60.

216.    As a result of Defendants' breach, Ms. Berland is entitled to specific performance or damages in the amount of $1,404,484.60, plus interest.

### FOURTH CAUSE OF ACTION

**Breach of the Implied Covenant of Good Faith and Fair Dealing Against Defendants Elon Musk, X Holdings, and X Corp.**

217.    Ms. Berland repeats and realleges each and every allegation contained above as if fully set forth herein.

218.    Ms. Berland's equity contracts with Twitter contain an implied covenant of good faith and fair dealing, which prohibits either party from acting in a way that prevents the other party from receiving the benefits of the contract.

219.    Defendants improperly frustrated Ms. Berland's ability to receive the interests that vested on November 1, 2022, to which she is entitled, by refusing to pay her the cash value of those interests. By depriving Ms. Berland of the benefits of the agreements which she earned by

performing her duties under the contract and to which she is entitled, Defendants breached the covenant of good faith and fair dealing.

220.    As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Ms. Berland is entitled to specific performance or damages, plus interest.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Leslie Berland respectfully requests that this Court grant the following relief:

A.    Declare that Defendants have violated the terms of the Plan by failing to pay Plaintiff benefits in accordance with the terms of the Plan;

B.    Order Defendants to pay benefits to Plaintiff pursuant to the terms of the Plan;

C.    Award compensatory damages for wage loss, including but not limited to for non-payment of RSU interests due to Plaintiff;

D.    Award equitable relief to Plaintiff, including but not limited to restitution, disgorgement, back pay, front pay and/or equitable surcharge;

E.    Order specific performance of the contracts and agreements alleged above;

F.    Award Plaintiff pre-judgment and post-judgment interest;

G.    Award Plaintiff's reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g); and

H.    Provide such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests trial by jury for her Third and Fourth causes of action.

//

//

//

COMPLAINT                                                                                   PAGE 47

Dated: November 1, 2024

Respectfully submitted,

RENAKER SCOTT LLP

By: _____/s/ Kirsten G. Scott_____
Kirsten G. Scott
Teresa R. Renaker

WIGGIN AND DANA LLP
Nathan E. Denning *(pro hac vice pending)*
Michael L. Kenny Jr. *(pro hac vice pending)*
Daniel J. LaRose *(pro hac vice pending)*
Gabriella E. Bensur *(pro hac vice pending)*

*Attorneys for Plaintiff Leslie Berland*