Nathan E. Denning (admitted *pro hac vice*)
Michael L. Kenny Jr. (admitted *pro hac vice*)
Daniel J. LaRose (admitted *pro hac vice*)
Gabriella E. Bensur (admitted *pro hac vice*)
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 551-2600
ndenning@wiggin.com
mkenny@wiggin.com
dlarose@wiggin.com
gbensur@wiggin.com

Teresa S. Renaker, Cal. Bar No. 187800
Kirsten G. Scott, Cal Bar. No. 253464
RENAKER SCOTT LLP
505 Montgomery St., Suite 1125
San Francisco, CA 94111
Telephone: (415) 653-1733
teresa@renakerscott.com
kirsten@renakerscott.com

*Attorneys for Plaintiff Leslie Berland*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO/OAKLAND DIVISION**

| | |
|---|---|
| LESLIE BERLAND,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>X CORP., f/k/a TWITTER, INC., X HOLDINGS, ELON MUSK, LINDSAY CHAPMAN, DHRUV BATURA, BRIAN BJELDE, and TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY,<br><br>　　　　Defendants. | Case No. 24-cv-07589-JSC<br><br>**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**<br><br>Date: January 30, 2025<br>Time: 10:30 a.m.<br>Place: Courtroom 8<br>Judge: Hon. Jacqueline Scott Corley<br><br>Complaint Filed: November 1, 2024<br>Trial: None Set |

Pursuant to the Court's November 12, 2024, Case Management Conference Order, the parties hereby submit this Joint Case Management Conference Statement:

## 1. Jurisdiction and Service

Plaintiff's claims arise under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA") and California state law. This Court has subject matter jurisdiction over Plaintiff's ERISA claims pursuant to 28 U.S.C. § 1331 because these claims arise under the laws of the United States. Plaintiff also brings claims for breach of contract and breach of implied covenant of good faith and fair dealing, over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. All Defendants have been served (or waived service) and have appeared in the action.

## 2. Facts

### a. Plaintiff's Brief Chronology of Facts

Plaintiff Leslie Berland brings this action to recover more than $20 million in employment benefits that she earned during her nearly seven years of dedicated and successful service as the Chief Marketing Officer ("CMO") of Twitter, Inc. ("Twitter"). These benefits arise in part from the Twitter Change of Control and Involuntary Termination Protection Policy (the "Plan"), and became due to Ms. Berland when, on November 1, 2022 (five days after Elon Musk acquired Twitter), Musk suddenly fired her. Nobody told Ms. Berland the reason for her termination, and nobody indicated it had been "for Cause" (a narrowly defined set of circumstances such as willful misconduct or a felony conviction under the Plan). Ms. Berland had been remarkably successful as Twitter's CMO, and the termination was a jarring reversal from Musk's own treatment of her throughout Twitter's ownership transition. Musk and his staff relied heavily on Ms. Berland as the primary Twitter executive assisting with the ownership transition. In the days leading up to, and after, the acquisition, the two communicated extensively by text message, on telephone calls, and in person at Twitter headquarters. Throughout Ms. Berland's work with Musk and his team on the ownership transition, no one expressed any dissatisfaction with Ms. Berland and certainly

did not suggest that they believed she had engaged in any conduct that could warrant termination "for Cause" as defined in the Plan. To the contrary, at one point, Musk's Chief of Staff Jehn Balajadia pulled Ms. Berland aside to confide, "you are the only one here [at Twitter] that Elon trusts."

Musk's lack of "trust" in others at Twitter came from the months leading up to the acquisition, which were notoriously contentious after Twitter sued Musk to enforce his agreement to buy Twitter. Musk eventually capitulated but was left with hard feelings toward most of Twitter's executives. To get even (and to try to increase the value of what he was buying by hundreds of millions of dollars), Musk hatched a plan to deprive those executives—including, among others, CEO Parag Agrawal, CFO Ned Segal, Chief Legal Officer Vijaya Gadde, and General Counsel Sean Edgett—of their employment benefits, including severance and equity. Musk's plan, details of which came to light after Musk and his lawyers bragged about it to Musk's authorized biographer Walter Isaacson, was to "force a fast close" so Musk "could fire . . . top Twitter executives 'for cause' before their stock options could vest." Musk did just that, notably excluding Ms. Berland, and then predictably denied each executive benefits under the guise of "for Cause" terminations (those denials are the subject of ongoing litigation in this Court).

Everything changed between Musk and Ms. Berland after another Twitter employee (Jean-Philippe Maheu ("JP")), whom Ms. Berland had vouched for with Musk, upset Musk by publicly second-guessing him in an October 2023 meeting. Out of petty retribution (and certainly not "for Cause"), Musk quickly and simultaneously fired both JP and Ms. Berland. Just hours before these terminations, Musk sent Ms. Berland the following text: "JP is not going to work out. Bad recommendation."

Musk's hasty decision to fire Ms. Berland over a purportedly "Bad recommendation" meant that Twitter owed Ms. Berland approximately $20 million in benefits under the Plan. Not wanting to pay Ms. Berland what she was owed, which would effectively come out of Musk's own pocket as Twitter's new owner, Musk and his team fell back on the same pretext they had

PAGE 3
**JOINT CASE MANAGEMENT CONFERENCE STATEMENT**
CASE NO. 24-CV-07589

recently employed with Twitter's other executives—they would claim, falsely, that Ms. Berland had actually been fired "for Cause". On November 27, 2022, twenty-six days after first notifying Ms. Berland she had been fired, Musk sent a letter to Ms. Berland (the "Termination Letter"), claiming for the first time that her termination had been "for Cause," and, therefore, that she was not entitled to any benefits under the Plan—not her severance pay; not her accelerated equity vesting; not even the payment of COBRA premiums to cover health insurance for Ms. Berland and her children. Musk's belated characterization of Ms. Berland's termination as "for Cause" was done for the unlawful purpose of denying Ms. Berland these benefits. Tellingly, the Termination Letter did not identify what the "Cause" of Ms. Berland's firing had been.

It would not be until June 6, 2023, six months after Ms. Berland submitted a claim for benefits under the Plan on December 8, 2022 (and seven months after her firing), that Musk's team (specifically, the purported "Administrator" of the Plan, a Musk employee and Defendant named Lindsay Chapman) first identified the purported "Causes" for her firing. One was that Twitter had been mismanaged prior to Musk's acquisition, which was the same manufactured "Cause" Musk had used against the other executives he fired before Ms. Berland. The second was that Ms. Berland had distributed amongst her team a modest bonus pool that the company had allocated to her department, which Ms. Berland had done only after Twitter's in-house and outside legal counsel had confirmed that such bonuses were consistent with the merger agreement. The third was that Ms. Berland had traveled by charter plane to assist Musk upon his initial arrival at Twitter on October 26, 2022, which Ms. Berland had done only with the express approval of the CEO and CFO in an effort to accommodate Musk's own requests. None of these were the real reason Musk fired Ms. Berland, and, regardless, the facts do not support any of these purported explanations as a legitimate basis for a "for Cause" termination as defined in the Plan. Moreover, because these purported "Causes" had never been shared with Ms. Berland until Defendants denied her claim (and, in truth, had never existed), Ms. Berland never had an opportunity to "cure" any supposed violation (such as by reimbursing the company for the cost

of her flights), as required by the Plan. Chapman's denial of Ms. Berland's claim demonstrated that Twitter's claims procedures were biased and inadequate due to conflict of interest—Chapman is employed by Musk, who stood to lose tens of millions of dollars if Ms. Berland's claim were granted.

Ms. Berland timely appealed the denial of Plan benefits on September 18, 2023. This was Ms. Berland's first opportunity to address any of the purported reasons for her firing. As Ms. Berland pointed out in her appeal letter, Defendants' reliance on the same supposed historical mismanagement of Twitter that Musk had used to fire the other executives back on October 27, 2022, could not have been the real reason for Ms. Berland's firing because she had not been fired with the other executives. Furthermore, many of Defendants' complaints—for example, that Twitter purportedly over-spent on real estate, company-wide headcount growth, infrastructure, "lavish events," "on-premises data centers," and "off-site cloud-based hosting fees"—either had nothing to do with Ms. Berland or involved matters on which Ms. Berland was not the ultimate decisionmaker. (The one category of expense for which Ms. Berland had some autonomy as Head of People—"fringe benefits"—substantially decreased during her tenure.) Other complaints were about actions that had been taken only with the approval of the CEO (and, in some cases, the Board) or after review by Twitter's legal counsel, including Twitter's allocation of a bonus pool for Ms. Berland's department (which Twitter also did for the departments reporting to other executives). Moreover, as to her flight to meet Musk in San Francisco on October 26, 2022 (and then her return flight to New York the next day to meet with one of Musk's advisors), those flights had been necessitated by Musk himself. In any event, both flights were booked only after Ms. Berland sought and received approval from her boss at the time, the CEO, and were purchased through Twitter's usual charter-flight vendor following the usual procedures through which Twitter arranged charter-flight travel for executives. In sum, these were precisely the types of bogus accusations that the Plan's narrow definition of "Cause" (and its provision for cure) were intended to foreclose.

Regardless, after taking every one of the 120 allowable days to consider Ms. Berland's appeal, Musk's team (the purported "Twitter Severance Administration Committee") denied it on January 16, 2024. The denial of Ms. Berland's appeal further demonstrated the bias and conflicts of interest in Twitter's procedures—the denial of the appeal not only ignored many of the arguments that Ms. Berland made in her appeal, but Defendants also created and relied on new "evidence," including a conclusory declaration from Musk himself. In it, Musk fails to identify the "Cause" for his termination of Ms. Berland, or whether he even knew about any of the alleged "Causes" at the time he abruptly fired Ms. Berland. Additionally, Defendants withheld documents from Ms. Berland, which inhibited her presentation of her Claim and facilitated Defendants' denial of that Claim.

Along with Ms. Berland's claims under ERISA § 502(a)(1)(B) and § 510, Ms. Berland also brings claims for breach of contract and breach of the implied covenant of good faith and fair dealing because Defendants did not pay her the cash equivalent of 25,913 Restricted Stock Units when those rights vested on November 1, 2022, the day she was terminated.

### b. **Defendants' Brief Chronology of Facts**

Plaintiff, who is Twitter's former Chief Marketing Officer, was terminated for cause on November 1, 2022, shortly after Twitter was purchased by entities associated with Elon Musk. That purchase was memorialized in a merger agreement inked on April 25, 2022. The merger agreement contained a stand-still provision that, among other things, prohibited increases in compensation to Twitter employees except as required pursuant to existing company plans.

Despite that provision, and contrary to express instructions from the acquiring entities, Plaintiff approved sweetheart retention and spot bonuses shortly before the merger closed in October 2022, in violation of the merger agreement. A few weeks later, Plaintiff wasted hundreds of thousands of dollars by—unnecessarily and without approval—booking private jet travel to and from Twitter headquarters on October 26 and 27, 2022. Plaintiff then refused to pay for her unapproved private jet travel, resulting in Twitter being sued for such payment and incurring

additional expense in the process. Plaintiff recklessly disregarded her duties to the company and engaged in "gross negligence" or "willful misconduct" within the meaning of the Plan.

After her termination for cause, Plaintiff submitted a claim for benefits under the Plan. However, severance benefits are not owed to former executives, like Plaintiff, who have been terminated for cause under the Plan's terms. Availing herself of the Plan's claims procedures, Plaintiff submitted her original claim for benefits with the help of experienced legal counsel.

Plaintiff's claim was decided by a neutral and unconflicted Plan Administrator. The Plan Administrator has broad discretionary authority to interpret the Plan and decide claims for benefits under the Plan. *See* Compl., Ex. A at ECF page 5 ("The Administrator will have full discretion to administer and interpret the [Plan]. Any decision made or action taken by the Administrator with respect to the [Plan], and any interpretation by the Administrator of any term or condition of the [Plan], or any related document, will be conclusive and binding on all persons and be given the maximum possible deference allowed by the law.").

The Plan Administrator carefully considered Plaintiff's claim before issuing a decision thoroughly explaining the reasons for denying the claim. The Plan Administrator concluded that Plaintiff was terminated for "Cause," within the meaning of the Plan, based on gross negligence or willful misconduct by (1) violating company policy when she incurred $200,000 in fees by traveling by charter plane to and from Twitter headquarters on October 26 and 27, 2022 without approval; (2) distributing amongst her team a $285,000 bonus pool that the company had allocated to her department in violation of the merger agreement; and (3) participating in corporate waste.

Plaintiff requested and received relevant documents, and subsequently submitted an appeal—again, through counsel—attaching evidence and other materials. Her appeal was considered and denied by a duly appointed Committee that reviewed and considered Plaintiff's appeal and other submissions, rendering a detailed opinion that thoroughly addressed Plaintiff's various arguments and the evidence that she offered in support. In the end, the Committee agreed with the Plan Administrator that Plaintiff was terminated for cause. Staff, including Plaintiff,

knew the merger agreement required Musk's consent to any increased retention bonus program and that Musk refused consent. Despite this, Staff members, including Plaintiff, took matters into their own hands and dramatically increased the retention bonuses they were providing to members of their respective teams. Plaintiff even took this a step further, by chartering a $200,000 private jet from New York to San Francisco without approval, then refusing to pay for the flights, which resulted in the company being sued by the airline company.

While Plaintiff may disagree with the Plan Administrator's and Committee's conclusions, she cannot dispute that the Plan expressly conferred discretionary authority on the Plan Administrator and Committee to interpret the Plan and decide claims for benefits under the Plan. As a result, that determination can be overturned only for an abuse of discretion. *See Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955 (9th Cir. 2006). Plaintiff cannot establish any abuse of discretion by the Plan Administrator or Committee. Plaintiff's ERISA § 502(a)(1)(B) claim, therefore, fails because she was terminated for cause and was ultimately determined to be ineligible for severance benefits based upon an independent assessment by the Plan Administrator and Committee.

As for Plaintiff's ERISA § 510 claim, it fails for the reasons identified in Defendants' Motion to Dismiss (Dkt. 29).

3. **Legal Issues**

The parties dispute the following legal issues: (1) which standard of review the Court should apply in resolving Plaintiff's claims for benefits; (2) if the Court applies abuse of discretion review, whether the purported administrators acted under a financial conflict of interest, and if so, what level of skepticism the Court should apply in reviewing their decisions; (3) whether the Plan is an ERISA Top Hat Plan; (4) the scope of the administrative record and materials the Court should consider in resolving the benefits claims; (5) whether Plaintiff is entitled to benefits under ERISA § 502(a)(1)(B); (6) whether Defendants interfered with Plaintiff's protected rights in violation of ERISA § 510; and (7) whether Defendants breached their agreements with Plaintiff

by failing to pay Plaintiff the cash equivalent of 25,913 RSUs when those rights vested on November 1, 2022.

### 4. Motions

The parties are in the process of briefing Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's second cause of action for interference with Plaintiff's protected rights in violation of ERISA § 510, part of which will address the issue of whether the Plan is an ERISA Top Hat Plan. Plaintiff anticipates filing a motion for partial summary judgment as to the standard of review of the benefits claims. The parties anticipate filing cross motions/briefing under Rules 52 and/or 56 as to the benefits claim as well as the other claims. Discovery motions are also possible. Should the parties dispute the propriety or scope of discovery, counsel will meet and confer in good faith. If counsel are unable to reach agreement in such a dispute, discovery motions will be necessary, as Plaintiff intends to pursue production of materials that Plaintiff contends were wrongfully withheld during the administrative appeal process and that she claims will show the conflict of interest and bias inherent in Twitter's ERISA process. Defendants dispute that any materials were wrongfully withheld during the administrative process and that there was any conflict of interest or bias in Twitter's ERISA process.

### 5. Amendment of Pleadings

The parties do not currently anticipate amending the pleadings but reserve their respective rights to do so and believe they will be better positioned to evaluate this after initial discovery. Plaintiff requests May 14, 2025, as a deadline to amend the complaint.

### 6. Evidence Preservation

The parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Evidence and will continue to meet and confer regarding the reasonable and proportionate steps to preserve evidence relevant to this action. Defendants have been notified and have instructed their agents to preserve documents relevant to Plaintiff's claims. Defendants have been notified to preserve potentially relevant documents and relevant third parties have been notified

of the litigation. Plaintiff has also been notified to preserve documents relevant to the claims and defenses.

**7.  Disclosures**

The parties have agreed to exchange initial disclosures under Federal Rule of Civil Procedure 26(a)(1) on or before January 30, 2025.

**8.  Discovery**

Plaintiff's position is that fact discovery should proceed regarding the following issues, notwithstanding the pending motion to dismiss: (i) the standard of review; (ii) the alleged conflict of interest and bias permeating the ERISA claims process; (iii) the additional documents that Defendants allegedly did not produce during the administrative process relating to the denial of Plaintiff's claims for benefits; and (iv) regarding the completeness of the administrative record; and as to her ERISA § 510 and state law claims, including discovery into the motivation behind Plaintiff's termination and the procedures surrounding her termination.

Plaintiff also opposes Defendants' suggestion below that all discovery be stayed pending the Court's ruling on Defendants' motion to dismiss Plaintiff's ERISA § 510 claim, as Plaintiff is entitled to discovery on her state-law claims (including breach of contract and breach of the implied covenant of good faith and fair dealing) regardless of Defendants' pending motion to dismiss. Because discovery on Plaintiff's state law claims will encompass issues that are the same or similar to those in dispute on Plaintiff's ERISA § 510 claim, the outcome of Defendants' pending motion to dismiss will not materially impact the scope of discovery.

Defendants' position is that discovery should be limited to: (1) the administrative record; (2) discovery relating to the Plan Administrator's and Committee's alleged conflict of interest in adjudicating Plaintiff's claim for benefits, and (3) discovery relating to Plaintiff's claims for breach of contract and breach of the duty of good faith and fair dealing involving the alleged breach of the equity agreement. Discovery concerning Defendants' alleged bias or pretext in connection with the decision to terminate Plaintiff is relevant only to Plaintiff's ERISA § 510

claim and may be obviated entirely by the Court's ruling on Defendants' pending motion to dismiss that claim.

Defendants propose that all discovery be stayed pending the Court's ruling on Defendants' motion to dismiss, which will clarify what claims remain at issue in the case and the scope of discovery.

**9.     Class Action**

Not applicable.

**10.    Related Cases**

*Personette, et al., v. Elon Musk, et al.*, No. 24-cv-06266-JSC is a "related" case within the meaning of Local Civil Rule 3-12(a).

**11.    Relief**

Plaintiff seeks severance benefits under the Plan in an amount exceeding $20,000,000. This amount is equal to one-year's salary of $600,000, plus fifty percent of the cash value of all of Ms. Berland's Unvested RSU Consideration and Unvested PSU Consideration interests, all valued at the acquisition price of $54.20 per share, and the value of twelve months of COBRA health insurance premiums owed to but never received by Ms. Berland, with the precise amount to be proven at trial. Plaintiff also seeks $1,404,484.60 in equity that vested November 1, 2022, with the precise amount to be proven at trial. Plaintiff also seeks appropriate equitable relief, as well as attorneys' fees, costs, and pre- and post-judgment interest which will continue to accrue until the case is resolved and any judgment is satisfied.

Defendants reserve their right to recover attorneys' fees and costs in the event they prevail on Plaintiff's claims in this action, and further reserve their rights to seek relief with respect to any claims or counterclaims they may later assert in this action.

### 12. Settlement and ADR

On January 9, 2025, counsel for the parties met and conferred about ADR. Plaintiff is amenable to a court-appointed mediation, private mediation, or a settlement conference before a magistrate judge or other judicial officer pursuant to ADR Local Rule 7.

Defendants are amenable to engaging in private mediation or a settlement conference before a magistrate judge or other judicial officer at the appropriate time.

### 13. Other References

The parties do not believe that the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

### 14. Narrowing of Issues

The parties have not identified any stipulations or other means to narrow the issues before the Court, other than as discussed in paragraph 4, above. As the case progresses, counsel will continue to meet and confer regarding ways to streamline the case.

### 15. Expedited Trial Procedures

The parties do not believe that this case is appropriate for the Expedited Trial Procedures of General Order 65 Attachment A.

### 16. Scheduling

| Deadline | Plaintiff's Proposal | Defendants' Proposal |
| --- | --- | --- |
| **Fact Discovery Cut Off** | November 12, 2025 ||
| **Plaintiff's Motion as to the Standard of Review** | Plaintiff's Motion: December 12, 2025<br><br>Defendants' Opposition: January 9, 2026<br><br>Plaintiff's Reply: January 23, 2026 | Defendants dispute that there is any need for a separate motion as to the standard of review, consistent with this Court's order regarding an identical request by the plaintiffs in the related *Personette v. Musk, et al.* matter (Dkt. 41, Case No. 3:24-cv-06266-JSC). |
| **Expert designations (if any)** | December 17, 2025 ||
| **Expert discovery cutoff (if any)** | February 16, 2026 ||

| **Briefing Relating to Rules 52 and/or 56** | Plaintiff's Opening Brief due June 26, 2026 |
| --- | --- |
| | Defendants' Opposition/Cross-Opening Brief for Judgment due July 24, 2026 |
| | Plaintiff's Reply/Opposition due August 28, 2026 |
| | Defendants' Reply due October 2, 2026 |
| **Hearing/Trial** | November 5, 2026 |

### 17. Trial

Plaintiff believes that any claims asserted in the Complaint that are not resolved through Rule 52 or Rule 56 motions will be tried by the Court or a jury, depending on the nature of the claims. Plaintiff estimates that the trial will last approximately one week.

Defendants believe that most, if not this entire case should be adjudicated through Rule 52 motions and that a separate bench trial will be unnecessary. If the case does proceed to trial in any respect, Defendants estimate the trial would take up to five court days. Plaintiff has no right to a jury trial.

### 18. Disclosure of Non-Party Interested Entities or Persons

Plaintiff filed her Certifications of Conflicts and Interested Entities or Persons on November 27, 2024, stating that there is no conflict or interest other than the named parties to report.

Defendants filed their Rule 7.1 Corporate Disclosure Statement and Civil L.R. 3-15 Certification of Conflicts and Interested Entities or Persons on November 25, 2024, stating that Defendant X Corp. is wholly owned by X Holdings Corp. and that there is no conflict or interest (other than the named parties) to report.

### 19. Professional Conduct

All attorneys of record for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

1  Dated: January 23, 2025                              Respectfully submitted,

                                        By:        *Gabriella E. Bensur*

                                        RENAKER SCOTT LLP
                                        Kirsten G. Scott
                                        Teresa R. Renaker

                                        WIGGIN AND DANA LLP
                                        Nathan E. Denning (admitted *pro hac vice*)
                                        Michael L. Kenny Jr. (admitted *pro hac vice*)
                                        Daniel J. LaRose (admitted *pro hac vice*)
                                        Gabriella E. Bensur (admitted *pro hac vice*)

                                        *Attorneys for Plaintiff Leslie Berland*


                                        By:        *Dylan Rudolph*

                                        MORGAN, LEWIS & BOCKIUS LLP
                                        Eric Meckley
                                        Jeremy Blumenfeld (admitted *pro hac vice*)
                                        Christopher Boran (admitted *pro hac vice*)
                                        Abbey Glenn
                                        Brian Sullivan (admitted *pro hac vice*)
                                        Dylan Rudolph

                                        *Attorneys for Defendants*

## CIVIL L.R. 5-1(h)(3) ATTESTATION

I, Gabriella E. Bensur, am the ECF user whose ID and password are being used to file this JOINT CASE MANAGEMENT CONFERENCE STATEMENT. In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that counsel for all parties have concurred in this filing.

DATED: January 23, 2025         By:        *Gabriella E. Bensur*
                                                      Gabriella E. Bensur