Nathan E. Denning (admitted *pro hac vice*)
Michael L. Kenny Jr. (admitted *pro hac vice*)
Daniel J. LaRose (admitted *pro hac vice*)
Gabriella E. Bensur (admitted *pro hac vice*)
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, New York 10022
Telephone: (212) 551-2600
ndenning@wiggin.com
mkenny@wiggin.com
dlarose@wiggin.com
gbensur@wiggin.com

Teresa S. Renaker, Cal. Bar No. 187800
Kirsten G. Scott, Cal Bar. No. 253464
RENAKER SCOTT LLP
505 Montgomery St., Suite 1125
San Francisco, CA 94111
Telephone: (415) 653-1733
teresa@renakerscott.com
kirsten@renakerscott.com

*Attorneys for Plaintiff Leslie Berland*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO/OAKLAND DIVISION

| | |
|---|---|
| LESLIE BERLAND,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>X CORP., f/k/a TWITTER, INC., X HOLDINGS, ELON MUSK, LINDSAY CHAPMAN, DHRUV BATURA, BRIAN BJELDE, and TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY,<br><br>　　　　　Defendants. | Case No. 24-cv-07589<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION**<br><br>Date: April 1, 2025<br>Time: 10:00 a.m.<br>Place: Courtroom 8<br>Judge: Hon. Jacqueline Scott Corley<br><br>Complaint Filed: November 1, 2024 |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................... 1

II.   STATEMENT OF RELEVANT FACTS ................................................................. 4

    A.  Pertinent Terms of the Plan and Plaintiff's Participation Agreement. ................... 4

    B.  Musk's Takeover of Twitter Results in Defendants Unlawfully Denying Other Twitter Executives Their Severance Benefits. ....................................................... 6

    C.  Musk and His Team Rely Heavily on Plaintiff During the Transition. ................. 7

    D.  Musk Terminates Plaintiff and Unlawfully Manufactures "for Cause" Justifications to Deprive Her of Her Severance Benefits. ...................................... 8

III.  LEGAL STANDARD ............................................................................................. 10

IV.   ARGUMENT .......................................................................................................... 10

    A.  The Complaint Adequately Pleads the Availability of Surcharge. ...................... 11

        1.  Top Hat Plans Are a Subset of ERISA Pension Plans. ............................. 13

        2.  The Plain Language of the Plan Demonstrates That It Is a Welfare Plan Designed to Protect Participants in the Event of a Company Change in Control. ..................................................................................................... 14

        3.  The Primary Purpose of the Plan Is Not to Provide for Deferred Compensation. ......................................................................................... 17

        4.  That the Plan Is Unfunded and the Participants Are Executives Do Not Alone Establish That The Plan Is a Top Hat Pension Plan. ....................... 20

        5.  Because Surcharge Is an Available Remedy for Plaintiff's ERISA Section 510 Claim, Defendants' Motion Fails in Its Entirety. ................................ 20

    B.  The Complaint Adequately Pleads the Availability of Front Pay. ...................... 21

    C.  The Complaint Adequately Pleads the Availability of Back Pay. ....................... 23

    D.  The Complaint Adequately Pleads the Availability of Restitution and Disgorgement. ...................................................................................................... 24

V.    CONCLUSION ...................................................................................................... 25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION

## <u>TABLE OF AUTHORITIES</u>

*Acosta v. FCE Benefit Administrators, Inc.*
   No. 17-CV-05448-JSW, 2018 WL 11447534 (N.D. Cal. Jan. 22, 2018)...............................24

*Alexander v. Brigham & Women's Physicians Org., Inc.*
   467 F. Supp. 2d 136 (D. Mass. 2006), *aff'd*, 513 F.3d 37 (1st Cir. 2008)..............................13

*Ashcroft v. Iqbal*
   556 U.S. 662 (2009) ...............................................................................................................10

*Bafford v. Admin. Comm. of Northrop Grumman Pension Plan*
   101 F.4th 641 (9th Cir. 2024) .........................................................................................10, 12

*Bakri v. Venture Mfg. Co.*
   473 F.3d 677 (6th Cir. 2007) ...............................................................................................15

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ...............................................................................................................10

*Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Illinois*
   983 F.3d 435 (9th Cir. 2020) .................................................................................................21

*Black v. Greater Bay Bancorp Exec. Supplemental Comp. Benefits Plan*
   No. 16-CV-00486-EDL, 2016 WL 11187255 (N.D. Cal. July 25, 2016) ...................12, 16, 17

*Blaj v. Stewart Enterprises*
   No. 09CV0734-LAB RBB, 2011 WL 669134 (S.D. Cal. Feb. 14, 2011) ..............................22

*Broam v. Bogan*
   320 F.3d 1023 (9th Cir. 2003) ...............................................................................................10

*Caldwell v. Musk*, No.
   24-cv-02022-MMC, 2024 WL 4654272 (N.D. Cal. Nov. 1, 2024).....................3, 7, 11, 23, 25

*Callan v. Merrill Lynch & Co*
   No. 09 CV 0566 BEN (BGS), 2010 WL 3452371(S.D. Cal. Aug. 30, 2010)...................15, 20

*Carr v. First Nationwide Bank*
   816 F. Supp. 1476 (N.D. Cal. 1993)......................................................................................13

*Colburn v. Hickory Springs Mfg. Co.*
   448 F. Supp. 3d 512 (E.D.N.C. 2020) ..............................................................................15, 19

*Collazo v. Infonet Servs. Corp.*
   No. CV-13-02206-PSG(AGRX), 2015 WL 13917163 (C.D. Cal. Apr. 8, 2015) .............15, 19

*Credit Managers Ass'n v. Kennesaw Life & Acc. Ins. Co.*
   809 F.2d 617 (9th Cir.1987) ..................................................................................................12

*Curtiss-Wright v. Schoonejongen*
   514 U.S. 73 (1995) ...................................................................................................... 20

*Demery v. Extebank Deferred Comp. Plan (B)*
   216 F.3d 283 (2d Cir. 2000) ...................................................................................... 19

*Depot, Inc. v. Caring for Montanans, Inc.*
   915 F.3d 643 (9th Cir. 2019) ................................................................................ 24, 25

Ditchey v. Mechanics Bank
   2016 WL 730290, Case No. 15-cv-04103-JSC (N.D. Cal., Feb. 24, 2016) ............. 19

*Duggan v. Hobbs*
   99 F.3d 307 (9th Cir. 1996) ...................................................................................... 17

*Fort Halifax Packing Co. v. Coyne*
   482 U.S. 1 (1987) ...................................................................................................... 18

*Gilliam v. Nevada Power Co.,*
   488 F.3d 1189 (9th Cir. 2007) ................................................................. 2, 13, 15, 16

*Greenburg v. Life Ins. Co. of N. Am.*
   No. 08-CV-03240, 2009 WL 1110331(N.D. Cal. Apr. 23, 2009) ............................ 21

*Howard v. Shay*
   100 F.3d 1484 (9th Cir. 1996) .................................................................................. 17

*In re IT Group, Inc.*
   448 F.3d 661 (3d Cir. 2006) ..................................................................................... 17

*In re New Valley Corp.*
   89 F.3d 143 (3d Cir. 1996) ....................................................................................... 14

*In re Rigel Pharms., Inc. Sec. Litig.*
   697 F.3d 869 (9th Cir. 2012) .................................................................................... 10

*Kaiden v. Musk.*, Case
   No. 4:24-cv-03554-MMC (N.D. Cal.) .......................................................................7

*Khoja v. Orexigen Therapeutics, Inc.*
   899 F.3d 988, 999 (9th Cir. 2018) ............................................................................ 10

*Kurisu v. Svenhard Swedish Bakery Supplemental Key Mgmt. Ret. Plan*
   No. 20-cv-06409-EMC, 2021 WL 3271252 (N.D. Cal. July 30, 2021) ................... 12

*Managing Directors' Long Term Incentive Plan ex rel. Comm. v. Boccella*
   2015 WL 2130876 (S.D.N.Y. May 6) ...................................................................... 13

Case No. 24-cv-07589-JSC

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

*Millsap v. McDonnell Douglas Corp.*
   368 F.3d 1246 (10th Cir. 2004) ................................................................. 23

*Mothe v. Mothe Life Ins. Co.*
   2012 WL 1565290 (E.D. La. Apr. 30, 2012) ............................................ 13

*Nursing Home Pension FundLoc. 144 v. Oracle Corp.*
   380 F.3d 1226 (9th Cir. 2004) ................................................................. 10

*Pane v. RCA Corp*
   868 F.2d 631(3d Cir. 1989) ..................................................................... 16

*Perez v. Brain*
   14-cv-03911-JAK, 2015 WL 3505249 (C.D. Cal. Jan. 30, 2015) ............ 24

*Personette v. Musk*
   Case No. 3:24-cv-06266-JCS (N.D. Cal.) ............................................ 7, 23

*Schwartz v. Gregori*
   45 F.3d 1017 (6th Cir. 1995) ................................................................... 23

*Tao v. Wu,*
   No. C 11-3248 PJH, 2012 WL 1123540 ............................................. 2, 12

*Teutscher v. Woodson*
   835 F.3d 936 (9th Cir. 2016) ........................................................ 21, 23, 24

*Traxler v. Multnomah Cnty.*
   596 F.3d 1007 (9th Cir. 2010) ................................................................. 21

*Wooten v. BNSF Ry. Co.*
   387 F. Supp. 3d 1078 (D. Mont. 2019), aff'd, 819 F. App'x 483 (9th Cir. 2020) ................. 22

*Zavala v. Kruse-W. Inc.*
   2021 WL 5883125(E.D. Cal. Dec. 13, 2021) ..................................... 24, 25

**Statutes**

29 C.F.R. § 2510.3-2 ......................................................................... 23, 24

29 U.S.C. § 1001 et seq. ................................................................ *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................... 16

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

In her Complaint, Plaintiff Leslie Berland pleaded four causes of action against Defendants arising out of Defendants' wrongful attempt to deprive Plaintiff of severance and other benefits to which she was and is legally entitled.  Defendants have now moved to dismiss one of those causes of action—for unlawful interference with a plan benefit in violation of ERISA § 510—on the narrow grounds that Plaintiff purportedly has not pleaded the availability of any form of equitable relief as a remedy for this violation.  Defendants' Motion, which does not dispute that Plaintiff has adequately pleaded every other element of her claim for unlawful interference, should be denied because Plaintiff has adequately pleaded the availability of equitable relief, including surcharge, front pay, back pay, restitution, and disgorgement, any one of which is sufficient to require denial of the Motion.

*First*, Plaintiff has adequately pleaded the availability of the remedy of surcharge. Defendants acknowledge that surcharge is an equitable remedy for an ERISA § 510 violation but nonetheless argue that surcharge cannot be a remedy here because the ERISA Plan at issue is a "top hat" plan to which no fiduciary duties apply.  (Motion ("Mot.") at 7-10.)  This is so, Defendants say, because the Plan was, among other things, maintained by Twitter "primarily for the purpose of providing deferred compensation" to certain employees.  (Mot. at 7 (quoting 29 U.S.C. § 1101(a)(1)).)  There are at least two problems with Defendants' argument.

For one thing, accepting Defendants' argument would require the Court to make a factual finding that the "primary purpose" of the Plan was to provide deferred compensation. To do this, the Court would need to find, contrary to the language of the Plan documents (which, among other things, expressly impose fiduciary duties ***inconsistent with*** a "top hat" plan, *see* ECF No. 1-2 at 5) and Twitter's public filings (which expressly ***disclaim*** the existence of any "deferred compensation" plans in which the named executive officers were eligible to participate, *see* ECF No. 30-3 at 71), that, in fact, Twitter intended for the Plan to be "primarily for the purpose of providing deferred compensation" and that the Plan in fact did so.  There is no way for the Court to do this on a motion to dismiss, where any factual disputes must be

resolved in favor of Plaintiff. *See, e.g.*, *Tao v. Wu*, No. C 11-3248 PJH, 2012 WL 1123540, at *1 (N.D. Cal. Apr. 3, 2012) ("The question of whether, in practice, the [] plan functioned as a top hat plan—and therefore was, in fact a top hat plan—is fundamentally a factual one, and it must be resolved with a proper factual and evidentiary record.").

For another thing, contrary to Defendants' arguments, the Plan simply ***cannot*** be a "top hat" plan because it is not a plan of deferred compensation. (*See* ERISA §§ 201(2), 301(a)(3), 401(a)(1), 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1) (defining top hat plan as a plan maintained by an employer "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees").) Instead, as the Plan itself says, it "is designed to be an 'employee welfare benefit plan,' as defined in Section 3(1) of [ERISA]," to provide a "lump-sum severance payment." (ECF No. 1-2 at 1.) The only "deferral" Defendants identify is that the lump sum payment will be made "on the 61st day following [a] Qualified Termination" and the possibility that, in certain circumstances where the IRS deems the lump-sum severance payment to be "deferred compensation under Section 409A," the payment might be made approximately six months later in order to comply with Section 409A of the Internal Revenue Code. (Mot. at 8-9.) Nothing in the Plan remotely suggests that "the nature of the benefit furnished" is "a pension plan [that] provides retirement income or other deferred income" as opposed to "a welfare plan [that] provides benefits upon the occurrence of various specified contingencies." *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1193 n.5 (9th Cir. 2007) (quoting 1 ERISA Practice & Procedure §§ 2:5, 2-16 to -17 (Clark Boardman Callaghan 2d ed. 2005)). To the contrary, everything in the Plan—from its description that it "is designed to provide certain protections . . . ***if***" specified events occur (ECF No. 1-2 at 1 (emphasis added)); to its description as "an 'employee welfare benefit plan,' as defined in Section 3(1) of [ERISA]," (*id.* at 1)); to its provision for a "lump-sum severance payment" (*id.* at 2)—shows that the plan is not a plan of "deferred compensation" and therefore cannot be a "top hat" plan. Consistent with all of this, and as Defendants strikingly fail to acknowledge, Judge Chesney has already decided in *Agrawal v. Musk*, No. 24-cv-01304-MMC, 2024 WL 4654442 (N.D. Cal. Nov. 1, 2024), and *Caldwell v. Musk*, No. 24-cv-02022-MMC,

2024 WL 4654272 (N.D. Cal. Nov. 1, 2024), that surcharge is available as a remedy to redress an ERISA § 510 violation under this very same Plan.[1]  These are reasons enough to deny Defendants' Motion.

*Second*, Plaintiff has adequately pleaded the availability of the remedy of front pay, which is another equitable remedy and reflects the amounts Plaintiff would have earned in the future absent the violation.  Defendants do not dispute that front pay is also an equitable remedy that, if adequately pleaded, warrants denial of the Motion.  Instead, Defendants argue that Plaintiff cannot establish "any expectation of remaining employed at Twitter following the October 2022 acquisition" because, as Defendants read the Complaint, "[i]f anything, Plaintiff alleges that her employment at Twitter post-acquisition was in doubt, given that other executives were terminated, as is common following any public-to-private corporate acquisition."  (Mot. at 13 (citing Complaint ¶ 56, which alleges that Defendant Elon Musk "fired several Twitter executives," notably excluding Plaintiff).)  But here again, Defendants forget that a motion to dismiss does not permit a movant to draw factual inferences in its own favor; rather, all well-pleaded facts must be accepted as true, and all inferences therefrom must be drawn in favor of Plaintiff.  And a review of Plaintiff's Complaint more than establishes that she had an expectation of remaining employed following the October 2022 acquisition, including the facts (1) that Plaintiff was ***not*** initially terminated with the other executives (and ***did not resign her position***) but instead ***remained employed beyond the acquisition date***; (2) that Plaintiff was "[s]urprised" by her termination, which came notwithstanding Plaintiff's ongoing post-acquisition assistance to Defendant Musk and Musk's own Chief of Staff's assurance that Plaintiff was "the only one here [at Twitter] that Elon trusts"; and (3) that, on the day of her termination, Plaintiff expressed that she was "rooting for" and "care[d] deeply about Twitter" and its team and the "massive" opportunity it had ahead of it.  (Compl. ¶¶ 4-8.)  The only inference the Court can draw from the Complaint at this stage is that Plaintiff had expected

---

[1] Defendants advanced their "top hat" argument before Judge Chesney, but she disregarded it because it was raised for the first time in reply.  *See Caldwell*, 2024 WL 4654272, at *5 n.5.

to remain at Twitter notwithstanding the acquisition, ***as she in fact did*** until the moment Defendant Musk terminated her.  Whether Plaintiff can ultimately prove her entitlement to front pay is a matter for another day; for purposes of the Motion, Plaintiff has more than adequately pleaded front pay as an available remedy.

*Third*, Plaintiff has also adequately pleaded the availability of equitable relief in the forms of back pay, restitution, and disgorgement.  Although Defendants confidently assert that back pay "is simply not equitable relief under ERISA", the Sixth Circuit disagrees, and the Ninth Circuit has reserved judgment on this question.  Courts within the Ninth Circuit have nonetheless followed the Sixth Circuit in finding that back pay is a form of equitable relief available under ERISA.  With respect to restitution and disgorgement, Defendants do not dispute that such remedies are equitable; instead, they complain that Plaintiff has failed to identify the specific accounts in which her funds are being held.  But this is a high bar of Defendants' own invention.  The Ninth Circuit permits plaintiffs to allege generally that Defendants are in possession of property belonging to a plaintiff, and Plaintiff here easily clears this hurdle in light of her allegations, among others, that she was terminated with an eye towards depriving her of specific benefits (including, but not limited to, a payment she was due to receive on November 1, 2022, the day of her termination), all of which gives rise to an inference that Plaintiff's property has been specifically identified by Defendants.  The facts uniquely in the possession of Defendants—such as the account in which Plaintiff's funds were held, and where those funds have gone since—will of course need to be developed in discovery.  But that is not a reason to conclude, at this early stage of the case, that there is no set of facts on which Plaintiff can establish a remedy for Defendants' wrongdoing.

Because Plaintiff has adequately pleaded several forms of available equitable relief, any one of which is sufficient to deny the Motion, Defendants' Motion must be denied.

## II.    STATEMENT OF RELEVANT FACTS

### A.    Pertinent Terms of the Plan and Plaintiff's Participation Agreement.

The Twitter, Inc. Change of Control and Involuntary Termination Protection Policy (the "Plan"), by its terms, is "designed to be an 'employee welfare benefit plan' as defined in

Section 3(1) of [ERISA]."  (ECF No. 1-2, at 2; *see* 29 U.S.C. § 1002(1).)  As Twitter stated in

its 2022 Proxy Statement, the company offered this welfare benefit plan because it believed that

"to properly motivate and incentivize our executive team in the event of a change of control and

to the possibility of a termination without 'cause' or a termination with 'good reason,' a

standardized 'double trigger' change of control and severance policy is critical.  Each NEO

[named executive officer] that remains employed with us participates in our Severance Policy,

which provides standardized payments and benefits to the NEOs in the event of a termination

without 'cause' by us or termination for 'good reason' by the participant, whether or not in

connection with a change of control, to make these benefits consistent among the executives

who have these arrangements."  (ECF No. 30-3 at 72.)

Plaintiff, via her Participation Agreement (ECF No. 1-3), was designated as an

employee eligible to participate in the Plan.  The "Change of Control Severance Benefits"

provided by the Plan include a cash severance paid as a "lump sum" on the sixty-first day

following a Qualified Termination, COBRA premiums to cover a specified period of time, and

immediate acceleration of equity vesting.  (ECF No. 1-2 at 2-3.)  Payment of Plan benefits is

contingent on a specified set of events, including an "Involuntary Termination" during a

"Change of Control Period."  (*Id*. at 2.)  The Plan defines an Involuntary Termination as "a

termination of employment by the Company other than for Cause, death or Disability or a

termination of employment by [the employee] for Good Reason" (*id.* at 4), and "Cause" as:

> (a) your unauthorized use or disclosure of the Company's
> confidential information or trade secrets, which use or disclosure
> causes material harm to the Company; (b) your breach of any
> agreement between you and the Company; (c) your failure to
> comply with the Company's written policies or rules, including its
> code of conduct; (d) your conviction of, or plea of "guilty" or "no
> contest" to, a felony under the laws of the United States or any state
> thereof; (e) your gross negligence or willful misconduct in the
> performance of your duties; (f) your continuing failure to perform
> assigned duties after receiving written notification of the failure
> from the Board (or for Eligible Employees other than the Chief
> Executive Officer, from the Chief Executive Officer); or (g) your
> failure to cooperate in good faith with a governmental or internal
> investigation of the Company or its directors, officers or employees,

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

> if the Company has requested your cooperation; provided, however, that "Cause" will not be deemed to exist in the event of subsections (b), (c) or (f) above unless you have been provided with (i) 30 days' written notice by the Board [of] the act or omission constituting "Cause" and (ii) 30 days' opportunity to cure such act or omission, if capable of cure.

(*Id.* at 3.)

The Plan also states that "[t]he Administrator is the 'named fiduciary' of the Policy for purposes of ERISA and will be subject to the fiduciary standards of ERISA when acting in such capacity." (*Id.* at 5.) Twitter has consistently maintained that the Plan is subject to the fiduciary standards of ERISA, including in a June 6, 2022 letter (the "Claim Denial Letter") from Defendant Lindsay Chapman ("Chapman") wherein Chapman identified herself as the "Administrator" of the Plan, proffered "Relevant Plan Provisions," and reconfirmed that the Plan's "Administrator" is "the 'named fiduciary' of the Policy for purposes of ERISA and will be subject to the fiduciary standards of ERISA when acting in such capacity." (*See* Declaration of Gabriella E. Bensur in Support of Plaintiff's Request for Incorporation by Reference and Request for Judicial Notice in Opposition to Defendants' Motion to Dismiss ("Bensur Decl.") Ex. A at 1-2, 4.) Further, Twitter's Proxy Statement filed with the SEC states that aside from a 401(k) plan, Twitter does not maintain any retirement or "deferred compensation" plans in which the named executive officers, including Plaintiff, were eligible to participate. (ECF No. 30-3 at 71.)

**B.    Musk's Takeover of Twitter Results in Defendants Unlawfully Denying Other Twitter Executives Their Severance Benefits.**

Musk agreed to buy Twitter for $44 billion in April 2022, but then attempted to back out of the deal. (Compl. ¶ 48.) Twitter sued Musk to enforce the agreement, resulting in Musk capitulating, but leaving him with hard feelings towards most of Twitter's executives. (*Id.* ¶¶ 6, 47-51.) In the days leading up to the deal closing on October 27, 2022, Musk was aware that certain executives would be entitled to payments under the Plan and another ERISA-governed plan that required change-of-control severance, totaling approximately $200 million. (*Id.* ¶ 52.) Musk put into action a scheme to unlawfully deprive multiple of those executives of their

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION

employment benefits that were earned and owed under the Plan. (*Id.* ¶ 53.) Remarkably, just before taking control of Twitter, Musk and his lawyers bragged to Walter Isaacson, Musk's authorized biographer, that Musk would intentionally terminate Twitter executives to deprive them of their benefits, outlining his plan to "force a fast close" so Musk "could fire . . . top Twitter executives 'for cause' before their stock options could vest." (*Id.* ¶ 54.) Minutes after he acquired Twitter, Musk fired several Twitter executives, including CEO Parag Agrawal ("Agrawal"), CFO Ned Segal ("Segal"), Chief Legal Officer Vijaya Gadde ("Gadde"), and General Counsel Sean Edgett ("Edgett"). Musk and his counsel Alex Spiro ("Spiro") acknowledged that Agrawal had "tried to resign" but boasted "we beat him." (*Id.* ¶ 6.) Musk also characterized these terminations as "for Cause" in an attempt to circumvent the "Change of Control" provisions in the Plan and deny these executives their benefits. Those denials are the subject of ongoing litigation before this Court and before Judge Chesney. (*See Agrawal v. Musk*, Case No. 3:24-cv-01304-MMC (N.D. Cal.); *Kaiden v. Musk.*, Case No. 4:24-cv-03554-MMC (N.D. Cal.); *Caldwell v. Musk*, Case No. 3:24-cv-02022-MMC (N.D. Cal.); *Personette v. Musk*, Case No. 3:24-cv-06266-JCS (N.D. Cal.).)

### C.    Musk and His Team Rely Heavily on Plaintiff During the Transition.

Unlike Agrawal, Segal, Gadde, and Edgett, Plaintiff was not initially a target of Musk's "fast close" strategy involving pretextual "for Cause" terminations. Instead, leading up to, during, and throughout the days following the closing, Plaintiff was Musk's primary contact with Twitter, the only Twitter executive with whom Musk was communicating, and the only Twitter executive team member Musk or his team asked for assistance during the ownership transition. (Compl. ¶ 58.) Plaintiff communicated directly and extensively with Musk in the days leading up to and after the closing. (*Id.* ¶ 59.)

At Musk's request, and after receiving approval from the CEO and CFO, Plaintiff flew from New York to San Francisco on less than one day's notice to receive Musk upon his arrival at company headquarters on October 26, 2022. (Compl. ¶ 62.) After being an instrumental part of Musk's visit to Twitter headquarters, on October 27, 2022, Plaintiff flew back to New York at the request of Musk's team to meet with Musk's advisor, Antonio Gracias, the following day.

(*Id.* ¶ 66.)  Thereafter, and after the merger closed, Musk continued to consult with Plaintiff on important and substantive matters.  (*Id.* ¶ 67-68.)  Plaintiff assisted Musk in scheduling his meetings in New York days after the merger closed, and she continued working on the transition, sharing lists of critical talent to retain across the company, introducing and connecting key leads to Musk's team, and working on Musk's plans for a reduction in force. (*Id.*)  Musk continued to trust Plaintiff, sharing the details of his proposed staffing cuts and discussing whether employees would "get their vest" of options.  (*Id.* ¶ 68.)  On October 31, 2022, Musk's Chief of Staff Jehn Balajadia sought to connect Plaintiff to Spiro, Musk's lawyer, further demonstrating Plaintiff's functioning relationship with Musk.  (*Id.* ¶ 70.)

**D.    Musk Terminates Plaintiff and Unlawfully Manufactures "for Cause" Justifications to Deprive Her of Her Severance Benefits.**

But Plaintiff's relationship with Musk suddenly changed.  Several days after the closing, Musk traveled to New York to, among other things, meet with advertisers and Twitter personnel.  (Compl. ¶ 71.)  Because Twitter Chief Commercial Officer, Sarah Personette, had just resigned, on October 29, 2022, Plaintiff suggested that Musk meet with the company's Head of Global Sales, JP Maheu ("Maheu"), once Musk arrived in New York.  (*Id.* ¶ 71.)  On October 31, 2022, during a meeting with Twitter advertisers, Maheu second-guessed Musk.  (*Id.* ¶ 76.)  Embarrassed and upset at being questioned, Musk blamed Plaintiff for Maheu's behavior, texting her just after midnight:  "[Maheu] is not going to work out.  Bad recommendation."  (*Id.*)

The next morning, November 1, 2022, just hours after Musk's "Bad recommendation" text, Plaintiff was fired from Twitter.  (Compl. ¶¶ 8, 77.)  This was a surprising turn of events for Plaintiff, who was faithfully assisting Musk with no intention to resign and "care[d] deeply about Twitter."  (*See id.* ¶ 8.)  Other than the purported "Bad recommendation," neither Musk nor anyone else at the company identified any reasons or cause for the termination, nor did Musk or anyone else tell Plaintiff that she was terminated "for Cause."  (*Id.* ¶¶ 7-8.)  At approximately the same time, Maheu was also fired.  (*Id.* ¶¶ 8, 77.)

It was not until weeks later that Musk sent Plaintiff a letter dated November 27, 2022,

notifying her that she had purportedly been terminated "for Cause" as of November 1, 2022. (Compl. ¶ 81.)  Musk's letter did not specify what conduct Plaintiff had engaged in that supposedly was the "Cause" for her termination, but rather only generally alleged that Plaintiff had failed to comply with the Twitter's "written policies" and engaged in "gross negligence or willful misconduct," parroting the language of the Plan's "for Cause" provision.  (*Id.* ¶¶ 39, 81-82.)  Musk's unilateral decision to retroactively deem Plaintiff's termination as "for Cause" under the Plan formed the basis for the eventual denial of Plaintiff's claim for benefits under the Plan.  (*Id.* ¶¶ 84-90, 99-174.)

Months later, Chapman articulated newly manufactured justifications for Plaintiff's purported "for Cause" termination in her denial of Plaintiff's claim.  (Compl. ¶ 89.)  One was that Twitter had been mismanaged prior to Musk's acquisition, which was the same manufactured "Cause" Musk had used against the other executives he fired before Plaintiff.  (*Id.* ¶ 11.)  The second was that Plaintiff had distributed amongst her team a modest bonus pool that the company had allocated to her department, which Plaintiff had done only after Twitter's in-house and outside legal counsel had confirmed that such bonuses were consistent with the merger agreement.  (*Id.*)  The third was that Plaintiff had traveled by charter plane to assist Musk upon his initial arrival at Twitter on October 26 and 27, 2022, which Plaintiff had done only with the express approval of the CEO and CFO in order to accommodate Musk's own requests.  (*Id.* ¶¶ 11, 119-125.)  None of these was the real reason Musk fired Plaintiff, and, regardless, the facts do not support any of these purported explanations as a legitimate basis for a "for Cause" termination as defined in the Plan.  (*Id.* ¶¶ 11, 99-180)  Musk's decision to terminate Plaintiff and deem that termination "for Cause" was designed to interfere with Plaintiff's rights to her severance benefits under the Plan.  (*See id.* ¶¶ 83, 177-180.)

Plaintiff brought four causes of action to remedy Defendants' wrongdoing in connection with her termination of employment:  (1) a claim for Plan benefits pursuant to ERISA § 502(a)(1)(B); (2) a claim under ERISA § 510 for unlawfully interfering with her right to obtain severance benefits; (3) a claim for breach of contract; and (4) a claim for breach of the implied covenant of good faith and fair dealing.  The only question presented on this Motion is

whether Plaintiff has adequately pleaded the availability of any equitable remedy for Defendants' violation of ERISA § 510.

## III.    LEGAL STANDARD

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff." *Bafford v. Admin. Comm. of Northrop Grumman Pension Plan*, 101 F.4th 641, 648 (9th Cir. 2024).  Defendants may not "present their own version of the facts at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).  Generally, courts disfavor motions to dismiss under Rule 12(b)(6).  *See Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (dismissal with prejudice proper only in "extraordinary" cases).  "A complaint should not be dismissed unless it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle him or her to relief." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1229 (9th Cir. 2004).  The motion should be denied if the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; that is, plaintiff must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable[.]'" *Khoja*, 899 F.3d at 1008 (internal citations omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Review of a motion to dismiss is "generally limited to the face of the complaint," but a court may consider "materials incorporated into the complaint by reference, and matters of which [it] may take judicial notice." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 875-76 (9th Cir. 2012).  Defendants' Request for Judicial Notice (ECF No. 30) and Plaintiff's accompanying Request for Incorporation by Reference and Request for Judicial Notice ask the Court to consider both types of materials.

## IV.    ARGUMENT

Defendants' Motion must be denied because the Complaint adequately pleads the availability of equitable remedies for Defendants' violation of ERISA § 510.  Those remedies include surcharge, front pay, back pay, restitution, and disgorgement, any one of which is

1    sufficient to deny the Motion.

2        **A. The Complaint Adequately Pleads the Availability of Surcharge.**

3        Defendants concede that surcharge is a form of equitable relief that the Court may

4    properly award in ERISA cases entailing breaches of fiduciary duty.  (Mot. at 7.)  Defendants

5    nonetheless erroneously argue that surcharge is unavailable under the Plan because it is a "top

6    hat" plan exempt from ERISA's fiduciary provisions.

7        Judge Chesney has already addressed whether surcharge is an available equitable

8    remedy for ERISA § 510 violations pertaining to ***this exact Plan***, holding that the plaintiffs in

9    the *Agrawal* and *Caldwell* cases adequately alleged that Musk acted as a fiduciary such that the

10   remedy of surcharge was available.  *See Agrawal*, 2024 WL 4654442, at *4-5; *Caldwell*, 2024

11   WL 4654272, at *5-6.  Tellingly, despite being represented by the same counsel, and despite

12   including ten different references to the *Agrawal* and *Caldwell* decisions in their Motion (*see*

13   Mot. at 11-13), Defendants omit ***any*** mention of Judge Chesney's ruling with respect to

14   surcharge.  More particularly, Defendants offer no explanation for how the Plan could both

15   impose fiduciary duties as decided in *Agrawal* and *Caldwell*, but also constitute a "top hat" plan

16   exempt from ERISA's fiduciary duties here.  Nor could they—the cases involve the same Plan.

17       In any event, unhappy with Judge Chesney's decision, Defendants press here the

18   argument that the Plan is a "top hat" plan that relieves them of any fiduciary duty with respect

19   to Plaintiff.  This position is a dramatic reversal from the position taken by the purported

20   Administrator of the Plan, Defendant Lindsay Chapman, who previously confirmed in writing

21   that she was the Administrator of the Plan, with the fiduciary duties attached to that role.  (Ex.

22   A at 1-2, 4.)  It is also flatly contradicted by the Plan documents and by Twitter's own public

23   statements regarding the Plan, all of which confirm that the Plan is—and was intended to be—a

24   welfare plan subject to ERISA's fiduciary duty provisions, not a "top hat" deferred

25   compensation plan exempted from those duties.  (ECF No. 1-2 at 1 ("The Policy is designed to

26   be an 'employee welfare benefit plan' as defined in Section 3(1) of [ERISA] . . . ."), 5 ("The

27   Administrator is the 'named fiduciary' of the Policy . . . and will be subject to the fiduciary

28   standards of ERISA . . . .").)  These inconsistencies demonstrate the most fundamental flaw

with Defendants' Motion—the only way the Court could find at this stage that the Plan is a "top hat" plan exempt from ERISA's fiduciary duty requirements would be to discard Plaintiff's allegations (and, indeed, overwhelming evidence) that the Plan was intended to be a welfare plan subject to ERISA's fiduciary provisions, not a plan "primarily for the purpose of providing deferred compensation" to Plaintiff and other employees. *See* ERISA §§ 201(2), 301(a)(3), 401(a)(1), 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). That is not something Defendants can ask the Court to do at this stage, where the Court must take the factual allegations as true and must also make all reasonable factual inferences in favor of Plaintiff. *See Bafford*, 101 F.4th at 648. Rather, to the extent Defendants seek to overcome the Plan's own language and their own past statements by trying to create a factual dispute regarding the Plan's nature, they must at minimum wait until later to do so. *See, e.g.*, *Tao*, 2012 WL 1123540, at *1 ("The question of whether, in practice, the [] plan functioned as a top hat plan—and therefore was, in fact a top hat plan—is fundamentally a factual one, and it must be resolved with a proper factual and evidentiary record." (citing *Credit Managers Ass'n v. Kennesaw Life & Acc. Ins. Co.*, 809 F.2d 617, 625 (9th Cir.1987) ("[T]he existence of an ERISA plan is a question of fact, to be answered in the light of all the surrounding circumstances from the point of view of a reasonable person"))); *Kurisu v. Svenhard Swedish Bakery Supplemental Key Mgmt. Ret. Plan*, No. 20-cv-06409-EMC, 2021 WL 3271252, at *10 (N.D. Cal. July 30, 2021) ("[T]he Court holds that there is a factual question as to whether the written Plan constitutes a top hat plan, and thus dismissal of the claim for equitable relief at this time is not appropriate."); *Black v. Greater Bay Bancorp Exec. Supplemental Comp. Benefits Plan*, No. 16-CV-00486-EDL, 2016 WL 11187255, at *13 (N.D. Cal. July 25, 2016) (declining to dismiss breach of fiduciary duty claim on the basis of whether a plan was a top hat plan at the pleading stage). For this reason alone, Defendants' Motion can and should be denied.

But Defendants' argument suffers from another flaw, which is that the Defendants **cannot** show that the Plan is a top hat plan. ERISA top hat plans are a narrow subset of pension plans exempt from ERISA fiduciary duties, and the Plan at issue in this case is not a pension plan, nor does it meet the specific criteria that a pension plan must meet to constitute a top hat

plan.  The text of the Plan, the Plan Administrator's own letter, and Twitter's SEC filings all indicate that the Plan is subject to ERISA fiduciary duties and is not a top hat plan, rendering Defendants unable to demonstrate that the Plan is a top hat plan.  *See Alexander v. Brigham & Women's Physicians Org., Inc.*, 467 F. Supp. 2d 136, 142 (D. Mass. 2006), *aff'd*, 513 F.3d 37 (1st Cir. 2008).  For this independent reason, the Motion must be denied.

1.  Top Hat Plans Are a Subset of ERISA Pension Plans.

An ERISA top hat plan is a specific, and narrow, type of pension plan.  The Plan here is a welfare plan, and not a top hat plan or any other type of pension plan.[2]

ERISA divides employee benefit plans into two broad categories:  pension (or retirement) plans, and welfare plans.  29 U.S.C. § 1002(1), (2); *see Gilliam*, 488 F.3d at 1193 n.5.  The difference between the two is "the nature of the benefit furnished—a pension plan provides retirement income or other deferred income, while a welfare plan provides benefits upon the occurrence of various specified contingencies."  *Gilliam*, 488 F.3d at 1193 n.5 (citation omitted).  As the Ninth Circuit has articulated, "[t]op hat plans represent a special category of ERISA pension benefit plans."  *Id.* (internal quotation and citation omitted); *see also Carr v. First Nationwide Bank*, 816 F. Supp. 1476, 1488 (N.D. Cal. 1993) ("it is clear that Top Hat plans are also not 'welfare benefit plans'").  Likewise, the United States Department of Labor ("DOL"), Employee Benefits Security Administration ("EBSA"), which administers and enforces Title I of ERISA, confirms that "[t]op hat plans are unfunded or insured pension plans" for a select group of management or highly compensated employees.  EBSA website, "Top Hat Plan Statement," available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/e-file/tophat-plan-filing-instructions.

---

[2] In their reply brief in further support of their motion to dismiss the ERISA § 510 claim in *Personette*, Defendants cite two out of circuit, unpublished cases for the proposition that welfare benefit plans can be top hat plans:  *Managing Directors' Long Term Incentive Plan ex rel. Comm. v. Boccella*, 2015 WL 2130876, at *1 (S.D.N.Y. May 6, 2015); and *Mothe v. Mothe Life Ins. Co.*, 2012 WL 1565290, at *2 (E.D. La. Apr. 30, 2012).  Neither authority is helpful, as the language Defendants quote does not contain holdings of those courts, but rather ***positions taken by the parties***.  Neither of those courts made any finding that top hat plans were or could be ERISA welfare plans.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION

If a plan is a pension plan, then it can constitute a top hat plan only if it is "unfunded and [] maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Gilliam*, 488 F.3d at 1192-93 (*quoting* ERISA §§ 201(2), 301(a)(3), 401(a)(1), 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1)). "The elements of this definition make the top hat category a narrow one," and thus "top hat plans form a rare sub-species of ERISA plans." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996).

Although top hat plans are subject to ERISA preemption and limitations on remedies, they are exempt from certain ERISA requirements imposed on other pension plans, including minimum participation standards, vesting standards, funding requirements, and ERISA's fiduciary standards. ERISA §§ 201(2) (participation and vesting), 301(a)(3) (funding), 401(a)(1) (fiduciary responsibilities), 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1); *see* ERISA §§ 502 (civil enforcement), 514 (preemption of state laws), 29 U.S.C. §§ 1132, 1144. Their exemption from funding, participation, and vesting requirements further confirms that top hat plans are a type of pension plan, because these ERISA requirements do not even apply to welfare benefit plans. *See* ERISA §§ 201(1), 301(a)(1), 29 U.S.C. §§ 1051(1), 1081(a)(1); *cf.* ERISA § 401(a), 29 U.S.C. § 1101(a) (fiduciary requirements generally applicable to welfare plans and pension plans, but not top hat pension plans).

2. The Plain Language of the Plan Demonstrates That It Is a Welfare Plan Designed to Protect Participants in the Event of a Company Change in Control.

The plain language of the Plan demonstrates that it is—and was intended to be—a welfare plan, not a top hat plan, or any other type of pension plan. The "actual language of the plan" is an important factor for a court to consider in determining what type of plan is at issue. *See Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007). Several cases relied on by Defendants confirm the importance courts place on the plan's "plain language" in determining the plan's type and purpose. *See Collazo v. Infonet Servs. Corp.*, No. CV-13-02206-PSG(AGRX), 2015 WL 13917163, at *1 (C.D. Cal. Apr. 8, 2015) (rejecting claim on a motion

to dismiss that the plan at issue was something other than a retirement plan, where the plan itself "clearly states that the purpose of the plan is to 'provide pension benefits'"); *Colburn v. Hickory Springs Mfg. Co.*, 448 F. Supp. 3d 512, 523 (E.D.N.C. 2020) (in analyzing top hat plan status, "[o]f particular importance was the plan's express terms."); *Callan v. Merrill Lynch & Co*, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371, at *12 (S.D. Cal. Aug. 30, 2010) (court considered language in plan document in determining what type of plan it was).

Here, on its face, the Plan states unequivocally that it is "designed to be an 'employee welfare benefit plan'" under ERISA, and that its aim is "to provide certain protections to a select group of key Twitter, Inc. . . . . employees if their employment is negatively affected by a change of control of Twitter." (ECF No. 1-2 at 2.) Thus, in addition to explicitly saying that it is a welfare (and not a pension) plan, the Plan's stated purpose fits squarely within the Ninth Circuit's description of welfare benefit plans: it provides benefits upon the occurrence of specified contingencies. *See Gilliam*, 488 F.3d at 1193, n.5. Specifically, severance benefits are owed under the Plan if there is a Change of Control at Twitter, and if the participant experiences an Involuntary Termination within twelve months, as those terms are defined in the Plan. (ECF No. 1-2 at 2-5.)[3]

Defendants wrongly assert that the Plan's primary purpose and benefit is to provide deferred compensation. (*See* Mot. at 8.) They rely on the Plan's reference to "deferred compensation," but that is nothing more than boilerplate language under Internal Revenue Code Section 409A, which addresses deferral of taxation on compensation that otherwise would be subject to immediate taxation. Specifically, the Plan says, "[t]he Company intends that all payments and benefits provided under this Policy or otherwise are exempt from, or comply with, the requirements of Section 409A," and any payments a person receives – from the Plan or otherwise – that are considered deferred compensation under Section 409A, "if any," will be paid in compliance with Section 409A. (ECF No. 1-2 at 4.) But all this language does is say

---

[3] Furthermore, Twitter never filed a top hat plan registration statement with the Department of Labor, again showing that the Plan is not a top hat plan. (*See* Bensur Decl. ¶ 3.)

that the Plan sponsor is aware of Section 409A, and that it intends to comply with this law to ensure that if benefits under the Plan are characterized by the IRS as deferred compensation, then they will not be taxable to the employee in the year of deferral but rather when they are received.  This language does not actually characterize the payment of Plan benefits as being subject to Section 409A, or as being deferred compensation.  To the contrary, it is obvious from the Plan terms that participants deferred nothing; prior to the contingent events occurring (Change of Control, and Involuntary Termination within twelve months), a participant has no immediate right to receive the amounts provided by the Plan, and thus has no risk of immediate taxation.  In any event, whether a particular payment is found to be subject to Section 409A is a separate inquiry from whether a plan is designed "primarily for the purpose of providing deferred compensation" for purposes of determining whether it constitutes a top hat pension plan.  *See Gilliam*, 488 F.3d at 1192-93.

Furthermore, the plain language of the Plan document confirms that the Compensation Committee of the Twitter Board "is the 'named fiduciary' of the Policy for purposes of ERISA and will be subject to the fiduciary standards of ERISA when acting in such capacity."  (ECF No. 1-2 at 5.)  But as discussed above, top hat plans are exempt from fiduciary rules.  ERISA § 401(a)(1), 29 U.S.C. § 1101(a)(1) (exempting top hat plans from fiduciary responsibilities); *Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir. 1989) (top hat plans "are not managed by fiduciaries and involve no fiduciary obligations of plan administrators toward plan participation").  The fact that Twitter specified a named fiduciary in the Plan document, and confirmed that it is subject to ERISA fiduciary standards, further confirms that Twitter never intended it to be a top hat plan.  *See Black*, 2016 WL 11187255 ("the Plan must also operate as a top hat plan").  The Court should not permit Defendants to renege, years later, on Twitter's promise to participants, as set forth in the Plan document, and again in the Claim Denial Letter sent to Plaintiff.  (*See* Bensur Decl. Ex. A at 1-2, 4.)  They promised that the Plan would be administered by an ERISA fiduciary, someone who is subject to the highest duties known to the law, *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996), and who is required to make decisions "with an eye single to the interests of the participants," *Donovan v. Bierwirth*, 680

1    F.2d 263, 271 (2d Cir. 1982).

2         In its motion to dismiss reply brief in *Personette*, Defendants also suggest that the Plan

3    does not meet requirements for an ERISA welfare plan based on certain DOL regulations (29

4    C.F.R. § 2510.3-2), and therefore must be an ERISA pension plan.  But this argument also fails.

5    Defendants misconstrue the DOL regulations by suggesting, incorrectly, that under the

6    regulations, all plans providing severance or accelerated equity vesting over a certain value

7    must be ERISA-governed pension plans, but this is not what the regulations say, and

8    Defendants do not and cannot cite to any case so holding.

9         3.    The Primary Purpose of the Plan Is Not to Provide for Deferred

10              Compensation.

11        The Plan also cannot be a top hat plan because it does not meet the requirement that its

12   primary purpose is to "provide for deferred compensation."  *See Duggan v. Hobbs*, 99 F.3d 307,

13   310 (9th Cir. 1996).  "A deferred compensation plan 'is an agreement by the employer to pay

14   compensation to employees at a future date.  The main purpose of the plan is to defer the

15   payment of taxes.'  The idea is to defer the receipt of compensation until retirement or

16   termination of employment, when the employee is in a lower tax bracket, thus reducing the

17   overall amount of taxes paid."  *In re IT Group, Inc.*, 448 F.3d 661, 664 (3d Cir. 2006) (*quoting*

18   David J. Cartano, Taxation of Compensation & Benefits §§ 20.01 & 20.02[A] at 709-710

19   (2004)); *see also* Black's Law Dictionary 383 (9th ed. 2010) (defining "defer" as "to postpone"

20   or "to delay").  But here, as alleged in the Complaint and as set forth in the Plan, the Plan

21   benefits—including cash severance, accelerated vesting of equity, and COBRA premiums—

22   become payable only if certain contingencies are met:  a Change of Control, and an Involuntary

23   Termination within twelve months.  (ECF No. 1-2 at 1-3.)  There was no agreement between

24   Plaintiff and Twitter to defer receipt of compensation owed to Plaintiff until a future date, nor

25   could there be under this Plan, because the benefits were not owed or payable unless and until

26   the contingencies occurred.  Then, if the contingencies did occur, the benefits became payable

27   immediately, as a lump sum.  The Plan contains no deferral of any kind.

28        Defendants' reliance on *Duggan* for the proposition that "severance benefits like those

                                   17                    Case No. 24-cv-07589-JSC

provided under the Plan constitute deferred compensation," (*see* Mot. at 14), is misplaced. The plan at issue in *Duggan* was nothing like the Plan at issue here. In *Duggan*, the Court held that a severance agreement provided for deferred compensation, and constituted an ERISA-governed top hat pension plan, based on the specific facts of the case, including that although the employee could have sought a lump sum payment of the severance, he instead negotiated for the employer to "provide him with lifelong retirement benefits" in the form of monthly payments payable until his death. 99 F.3d at 309, 310. That arrangement made the benefit a pension benefit, and its purpose was to defer or delay the receipt of compensation until a later date, which provides the individual with a tax advantage, instead of receiving a lump-sum payment. This comports with the conclusion that "compensation is deferred when it is received by the employee significantly after the services are rendered." *Id.* at 311-12 (*citing* Temporary Treas. Reg. § 1.404(b)–1T). Here, in stark contrast, the Plan provides for an immediate lump-sum payment of benefits if the Change in Control and Involuntary Termination provisions are met, and does not provide for any deferral of compensation. (*See* ECF No. 1-2 at 1 ("Upon a Qualified Termination, you will be eligible to receive a lump-sum severance payment.").)

Other than asserting, in conclusory fashion, that the Plan in this case is a deferred compensation plan like the one in *Duggan*, Defendants articulate no reason why the severance benefits provided under this Plan should be construed as deferred compensation. Instead, Defendants seem to contend that all severance plans or agreements must constitute deferred compensation. That is not the law—severance plans may be welfare or pension plans. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, at 7 n.5 (1987) (ERISA welfare benefit plans include plans that pay severance benefits); *Delaye v. Agripac, Inc.*, 39 F.3d 235, 237 (9th Cir. 1994) ("[p]rovisions for severance pay may constitute an employee welfare benefit plan within the meaning of ERISA."); *see also* 29 C.F.R. § 2510.2-2 (noting that severance pay plans "shall not be deemed to constitute an employee pension benefit plan or pension plan solely by reason of the payment of severance benefits" if certain requirements are met).

In fact, in *Ditchey v. Mechanics Bank*, this Court addressed a change in control severance plan indistinguishable from this Plan. The benefits under the *Ditchey* plan included

(a) severance pay equal to 200% of the employee's compensation, (b) a prorated short-term incentive award, (c) reimbursement of COBRA premiums, (d) complete vesting of certain benefits, and (e) executive outplacement services, and this Court determined that the plan was an ERISA-governed employee welfare benefit plan (and thus, not a top hat pension plan that provided for deferred compensation).  Case No. 15-cv-04103-JSC, 2016 WL 730290, at *3 (N.D. Cal., Feb. 24, 2016) (citing *Delaye*, among other authorities).  As in *Ditchey*, the Plan here provides for benefits that include:  (a) a lump sum of cash severance equal to one year of the employee's base salary, (b) payment of one year of COBRA premiums, and (c) accelerated vesting of equity.  (Compl. ¶ 40; ECF No. 1-2 at 1.)  *Ditchey* renders Defendants' position untenable.

Defendants' other top hat plan authority, unlike this case, involved plans in which the parties ***agreed*** that the plans provided deferred compensation.  *See Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 285 (2d Cir. 2000) (undisputed that plan "allowed participants to defer up to 25% of their salary as contributions to the Plan," with benefits payable upon reaching retirement age, and at issue was whether the plan was funded or unfunded); *Collazo*, 2015 WL 13917163, at *1 (undisputed that a supplemental executive retirement plan provided pension benefits, and at issue was whether retiree medical benefits provided under the same plan were also subject to top hat plan rules); *Colburn*, 448 F. Supp. 3d at 518-19, 523-28 (undisputed that a plan was a supplemental executive retirement plan intended to provide retirement income to specified employees, and at issue were questions regarding the plan's funding and covered employees).  The Plan at issue here contains no provision for deferred compensation nor any other form of retirement benefits.[4]

---

[4] In their reply brief in further support of their motion to dismiss the ERISA § 510 claim in *Personette*, Defendants argue that the Plan provides for deferred compensation because it provides equity awards, which are considered a type of "deferred compensation."  *Personette*, Case No. 3:24-cv-06266-JCS, ECF No. 46 at 10.  But this ignores the plain language of the Plan—these equity awards are granted pursuant to a different plan, (ECF 1-4 (Twitter, Inc. 2013 Equity Incentive Plan)), and the Plan provides for immediate vesting and payout, (ECF No. 1-2 at 1), which does not constitute "deferred compensation."

Defendants also rely on *Callan*, but that case further demonstrates why the Plan is not a top hat plan. 2010 WL 3452371. The *Callan* court held that, to constitute a top hat plan, the plan "must possess a retirement purpose and systematically provide for deferred income." *Id*. at *8. Here, the Plan has no retirement purpose, and it does not systematically provide for the deferral of any income.

### 4. That the Plan Is Unfunded and the Participants Are Executives Do Not Establish That The Plan Is a Top Hat Pension Plan.

Defendants further argue that the Plan is a top hat plan because it is unfunded and offered to only a select group of highly compensated employees. Although both of those elements are necessary for a plan to be considered a top hat plan, neither is sufficient to establish a top hat plan.

Unfunded plans can constitute welfare benefit plans under ERISA. *See* ERISA § 301(a)(1), 29 U.S.C. § 1081(a)(1); *Curtiss-Wright v. Schoonejongen*, 514 U.S. 73, 78 (1995) ("Nor does ERISA establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans."). That the Plan was unfunded does not establish that it is a top hat plan.

That the Plan was, according to Defendants, offered to only a select group of management or highly compensated Twitter employees also does not mean that it is a top hat plan. Instead, as stated in Twitter's May 2022 proxy statement, offering the Plan to key Twitter executives was a strategy implemented by Twitter in order to retain key executives leading up to, and through, a potential merger or other change in control event. (ECF No. 30-3 at 72.)

### 5. Because Surcharge Is an Available Remedy for Plaintiff's ERISA Section 510 Claim, Defendants' Motion Fails in Its Entirety.

Defendants' only argument for dismissal of surcharge as a remedy for Plaintiff's ERISA § 510 claim is that the Plan is purportedly a "top hat" plan. Because that argument fails for the reasons set forth above, Defendants' Motion fails with respect to surcharge and, by extension, fails in its entirety. Accordingly, upon concluding that Defendants' Motion fails with respect to surcharge, the Court may deny Defendants' Motion without reaching any of Plaintiff's

arguments regarding other available forms of equitable relief.  *See Agrawal v. Musk*, WL 4654442, at *5 ("In light of this finding [that surcharge is available], the Court does not address herein plaintiffs' argument that they can demonstrate entitlement to other equitable remedies . . . ."); *see also Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Illinois*, 983 F.3d 435, 442 (9th Cir. 2020) (where plaintiffs sufficiently alleged waiver in support of claim for benefits, that was sufficient for claim to proceed without court considering entitlement to estoppel).

### B.  The Complaint Adequately Pleads the Availability of Front Pay.

The Complaint also adequately pleads the availability of front pay, which is another equitable remedy for a violation of ERISA § 510.  *See Teutscher v. Woodson*, 835 F.3d 936, 948 (9th Cir. 2016) (reviewing award of front pay as an equitable remedy for a violation of ERISA § 510); *Greenburg v. Life Ins. Co. of N. Am.*, No. 08-CV-03240, 2009 WL 1110331, at *3 (N.D. Cal. Apr. 23, 2009) ("Reinstatement of employment, front pay and back pay may be an appropriate remedy under § 1132(a)(3) if an employer discharges or otherwise discriminates against an employee to avoid paying benefits or in retaliation for exercising rights under a benefit plan.").  Indeed, "[t]he characterization of front pay as an equitable remedy is consistent with the general nature of front pay in the context of other employment-related statutes." *Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1012 (9th Cir. 2010).

According to the Complaint, Plaintiff worked faithfully to assist Musk with the ownership transition and continued working with him after the transition.  (*See* Compl. ¶¶ 4, 58-66, 70 (Plaintiff was Musk's point person at Twitter, connecting with Musk's inner circle including his Chief of Staff and counsel); ¶¶ 106-118 (Plaintiff immediately traveled to California at Musk's behest to work on the transition); ¶¶ 67-70 (Plaintiff continued to work with Musk and at Twitter after Musk's acquisition of Twitter).)  Plaintiff was surprised by the termination from a company she felt passionately about and to which she had been devoted, and she expressed her surprise to Musk right after discovering she was being escorted out of Twitter's New York office by security.  (*Id.* ¶ 8.)  And Plaintiff, unlike other executives, never tendered a resignation at any time.  On these facts, one available remedy for Defendants'

unlawful conduct is front pay. *See Blaj v. Stewart Enterprises*, No. 09CV0734-LAB RBB, 2011 WL 669134, at *3 (S.D. Cal. Feb. 14, 2011) ("If Blaj's termination was indeed wrongful under ERISA, she may be entitled to front pay as equitable relief in lieu of reinstatement."); *Wooten v. BNSF Ry. Co*., 387 F. Supp. 3d 1078, 1102 (D. Mont. 2019), aff'd, 819 F. App'x 483 (9th Cir. 2020) ("Wooten was wrongfully terminated by [defendant], cutting short what he hoped would be a lifetime career with great benefits and excellent pay.").

Defendants ignore the substance of the Complaint to argue that Plaintiff has not alleged "any expectation of remaining employed at Twitter following the October 2022 acquisition," self-servingly characterizing Plaintiff's employment prior to the wrongful conduct as "in doubt." (Mot. at 13.) For support, Defendants rely entirely on Paragraph 56 of the Complaint, which states only that Musk had already fired *other* executives. (*See* Compl. ¶ 56.) But construed in the light most favorable to Plaintiff, as it must be, this allegation actually cuts against Defendants. Musk's termination of other executives while he continued to work with Plaintiff, reposed trust in her, and retained her beyond the acquisition date shows that Plaintiff rightly had an expectation that her employment would continue beyond the acquisition. (Compl. ¶¶ 56, 58, 65, 68.) Indeed, her employment *did continue beyond the acquisition*. (Compl ¶¶ 58, 59.) Similarly ignored by Defendants is Plaintiff's allegation that the termination caught her by "[s]urprise" (*id.* ¶ 8), which is understandable given that she was the sole executive assisting in the transition and had not been among the executives Musk had initially decided to terminate (Compl. ¶¶ 56, 58).

Similarly unpersuasive are Defendants' citations to Judge Chesney's decisions in *Agrawal* and *Caldwell* for the proposition that Plaintiff is not entitled to front pay because the Complaint did not allege that Plaintiff would have continued working for Twitter after the merger. (Mot. at 13.) Neither of those cases—nor the *Personette* case, where Defendants make an almost identical argument—have fact patterns like Plaintiff's. The plaintiffs in *Agrawal*, *Caldwell*, and *Personette* all resigned or intended to resign, a fact Judge Chesney relied on in her decisions. *See Agrawal*, 2024 WL 4654442, at *4 n.5; *Caldwell*, 2024 WL 4654272, at *4. Those plaintiffs were not entitled to front pay because they *intended to leave their employment*

at the same time they were terminated.  That is not the case here, where Plaintiff never resigned and was surprised by her termination.  (Compl. ¶ 8.)  Comparing Plaintiff to the plaintiffs in the *Agrawal*, *Caldwell*, and *Personette* merely highlights how different Plaintiff's circumstances were from the others'.

Lastly, Defendants make much of a supposed requirement to show the amount a plaintiff was "reasonably certain" to have earned "but for [her] wrongful discharge."  *Teutscher*, 835 F.3d at 948.  But Defendants get ahead of themselves.  *Teutscher* instructs that such a calculation is for the finder of fact to decide upon the presentation of testimony and other evidence.  *Id.*  The Complaint sufficiently alleges an entitlement to front pay, the amount of which should be determined based upon the evidence.  For this independent reason, Defendants' Motion should be denied.

### C.  The Complaint Adequately Pleads the Availability of Back Pay.

The Complaint also adequately pleads the availability of back pay.  Defendants do not dispute that Plaintiff's Complaint contains sufficient factual matter supporting an award of back pay; instead, they argue only that back pay "is simply not equitable relief under ERISA."  (Mot. at 13-14.)  Defendants do not identify any binding authority supporting that broad statement, and Plaintiff is aware of none.  Instead, Defendants rely on the Tenth Circuit case of *Millsap v. McDonnell Douglas Corp*., 368 F.3d 1246, 1260 (10th Cir. 2004), in which the Court found that a "freestanding claim for backpay" was precluded.  Defendants fail to acknowledge, however, that the Sixth Circuit has concluded that back pay *is* properly characterized as equitable relief under ERISA.  *See Schwartz v. Gregori*, 45 F.3d 1017, 1022-23 (6th Cir. 1995) ("[W]e conclude that the back pay awarded here constituted restitution, and therefore is an equitable remedy available under § 502(a)(3).").  What is more, the Ninth Circuit has not weighed in on this circuit split and, indeed, in *Teutscher*, the other case Defendants cite here, the Ninth Circuit expressly declined to reach the issue.  *See Teutscher*, 835 F.3d at 946 n.3 ("The district court in this case held that back pay is unavailable under ERISA.  Because Teutscher has not appealed that decision, we do not reach that issue here.").  Courts in this circuit have nevertheless followed the Sixth Circuit and found that back pay is an appropriate remedy for violation of

1    ERISA § 510.  *See Acosta v. FCE Benefit Administrators, Inc.*, No. 17-CV-05448-JSW, 2018

2    WL 11447534, at *10 (N.D. Cal. Jan. 22, 2018) (noting circuit split and declining to dismiss

3    claim for back pay); *Perez v. Brain*, 14-cv-03911-JAK, 2015 WL 3505249, at *11 (C.D. Cal.

4    Jan. 30, 2015) (noting that "[b]ack pay, as restitutionary relief, is an equitable remedy").

5        Under these circumstances, Defendants have not met their burden to show that back pay

6    is, as a matter of law, unavailable as an equitable remedy in this case.  For this independent

7    reason, Defendants' Motion should be denied.

8        **D.  The Complaint Adequately Pleads the Availability of Restitution and**

9        **Disgorgement.**

10       The Complaint also adequately pleads the availability of restitution and disgorgement.

11   Restitution and disgorgement are forms of equitable relief available under ERISA § 502(a)(3)

12   so long as they target property in a defendant's possession.  *Depot, Inc. v. Caring for*

13   *Montanans, Inc.*, 915 F.3d 643, 661-65 (9th Cir. 2019); *Zavala v. Kruse-W. Inc.*, 2021 WL

14   5883125, at *6-7 (E.D. Cal. Dec. 13, 2021).  Restitution targets "property identified as

15   belonging . . . to the plaintiff" while disgorgement targets "the 'proceeds' from disposing of

16   [such] property as well as 'profits derived' from the illicit use of that property."  *Id.* at 661, 664.

17   In *Depot*, the Ninth Circuit set forth three methods by which a plaintiff could allege that the

18   money or property sought is in the possession of defendants and therefore state a claim for such

19   relief under § 1132(a)(3).  First, a plaintiff may "identif[y] a specific fund to which they are

20   entitled."  *Depot*, 915 F.3d at 662.  Second, a plaintiff may allege "the existence of a general

21   account in which the ill-gotten funds . . . were commingled, such that the product of those funds

22   would be traceable."  *Id*. at 663.  And third, a plaintiff may allege that defendants' "account

23   balance remained above the [alleged] amounts" for purposes of the "lowest intermediate

24   balance" theory.  *Id*. at 664.

25       Defendants argue that the Complaint does not allege "a specific, identifiable fund to

26   which [plaintiff is] entitled" and, therefore, as Judge Chesney found in *Caldwell*, restitution and

27   disgorgement are unavailable.  (Mot. at 11.)  But the Complaint here does allege entitlement to

28   identifiable funds when it alleges that Plaintiff was terminated with an eye towards depriving

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

her of specific, lump-sum benefits that were due to paid in the near future (Compl. ¶ 46), allegations which give rise to an inference that Plaintiff's property was at one time specifically identified by Defendants such that those funds can be traced to where they reside today.  It is true, of course, that Plaintiff cannot now identify with specificity the account in which such funds were held and where, if anywhere, Defendants have since moved those funds.  All of this is information uniquely in the possession of Defendants.  But *Depot* does not require a plaintiff to allege such details beyond the fact that the monies are in possession of Defendants*, 915 F.3d 643, at 661-65, and Plaintiff should be permitted to establish in discovery the location of these identifiable funds.  As another court has explained, "the identity of a specific fund, whether particular assets were commingled in a general account, and whether defendants' account balances remained above a specific dollar amount, is information likely to be unavailable to plaintiff in the absence of discovery.  So long as plaintiff has a good faith basis for his allegations, such facts need be alleged only generally."  *See Zavala*, 398 F. Supp. 3d at 742 n.3. The Court should therefore permit Plaintiff to take discovery regarding what Defendants did with the funds that were owed to her so that she can establish her right to restitution and disgorgement of those funds.  In all events, to deny Plaintiff of an otherwise available ***remedy*** due to her inability to plead specifics about what Defendants did with monies that were owed to her would be inappropriate at this early stage.

## V.    CONCLUSION

For these reasons, the Court should deny Defendants' Motion to Dismiss.  In the alternative, if the Court grants any part of the Motion, Plaintiff respectfully requests leave to amend her Complaint pursuant to Federal Rule of Civil Procedure 15.

Dated: February 4, 2025                    Respectfully submitted,


By:        */s/Gabriella E. Bensur*

RENAKER SCOTT LLP
Kirsten G. Scott
Teresa R. Renaker

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

WIGGIN AND DANA LLP
Nathan E. Denning (admitted *pro hac vice*)
Michael L. Kenny Jr. (admitted *pro hac vice*)
Daniel J. LaRose (admitted *pro hac vice*)
Gabriella E. Bensur (admitted *pro hac vice*)

*Attorneys for Plaintiff Leslie Berland*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION